[Cite as *In re C.B.*, 2012-Ohio-2691.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

IN THE MATTER OF:

    C.B.,                              CASE NO. 13-12-06

NEGLECTED/DEPENDENT CHILD.

[LATOYA BROWN - APPELLANT]        O P I N I O N
[JAMES CARSWELL - APPELLANT]

IN THE MATTER OF:

    J.C.,                              CASE NO. 13-12-07

NEGLECTED/DEPENDENT CHILD.

[LATOYA BROWN - APPELLANT]        O P I N I O N
[JAMES CARSWELL - APPELLANT]

**Appeals from Seneca County Common Pleas Court
Juvenile Division
Trial Court Nos. 20850071 and 20850072**

**Judgments Affirmed**

**Date of Decision:  June 18, 2012**

Case No. 13-12-06 and 13-12-07

**APPEARANCES:**

*Scott B. Johnson* **for Appellant, James Carswell**

*Shane M. Leuthold* **for Appellant, Latoya Brown**

*Tiffany F. Hoyt* **for Appellee, Seneca Co. Dept.**
     **of Job & Family Services**

**SHAW, P.J.**

{¶1} Mother-appellant, Latoya Brown ("Latoya"), and father-appellant, James Carswell ("James"), appeal the January 6, 2012 judgment of the Seneca County Court of Common Pleas, Juvenile Division, granting permanent custody of their children, C.B and J.C., to appellee, the Seneca County Department of Job and Family Services (the "Agency"), and terminating their parental rights.

{¶2} On August 21, 2008, the Agency filed a complaint alleging C.B. (born in August of 2006) and J.C. (born in October of 2007) to be neglected and dependent children. The complaint was filed based upon information received by the Agency that the children had witnessed an episode of domestic violence between Latoya and a male companion in a motel room in Monroe, Michigan. Latoya was reportedly under the influence of drugs at the time. The police were called to the scene and Latoya was arrested and placed in jail as a result of the

incident.[1]  The same day the Agency also filed an ex parte motion for temporary custody, requesting the children be placed in the temporary custody of their maternal grandmother and under the protective supervision of the Agency, which was subsequently granted by the trial court.

{¶3} On October 27, 2008, a shelter care hearing was held.  The evidence adduced at this hearing revealed that James was the putative father of C.B. and J.C., and that genetic testing was completed in Lucas County finding James to be C.B.'s biological father.  However, there was no indication that James submitted to genetic testing with regard to J.C.  It was later confirmed through genetic testing that James is also J.C.'s biological father.

{¶4} On October 3, 2008, the Agency filed a case plan, which addressed Latoya's and James' history of domestic violence and substance abuse, and attempted to remedy the issues prompting the Agency's removal of the children, which included Latoya's and James' inability to provide their children with stable housing.  Both Latoya and James were required to submit to substance abuse assessments, to attend classes on domestic violence, substance abuse and parenting, and to provide stable and appropriate housing for the children.  In an amendment to the case plan, Latoya was prohibited from visiting the children at the home of their maternal grandmother and was required to set up visitation

---

[1] The record indicates that Latoya later pled guilty to an "assaulting/resisting and obstructing a police officer" charge, a felony under Michigan law.

through the Agency. James was permitted to have unsupervised visitation with the children upon the successful completion of a home study.

{¶5} On November 19, 2008, the adjudication hearing was held. Latoya did not attend the hearing because she was in jail at the time. James was also not present at the hearing, or at any of the prior hearings, despite being properly served with notice of the proceedings. Based on the evidence elicited at the hearing, the magistrate adjudicated the children neglected and dependent. The findings and recommendations of the magistrate were journalized in her January 22, 2009 decision, which was subsequently adopted and approved by the trial court.

{¶6} On March 10, 2009, the Agency filed a motion for ex parte orders requesting the children be removed from their placement in their maternal grandmother's home due to concerns that their maternal grandmother was abusing drugs. The information came about after the children's maternal grandmother was involved in a single car accident. The police found drugs in the car and the children's maternal grandmother tested positive for cocaine on a drug screen. As a result, the Agency took temporary custody of the children, whom were then placed in foster care. The goal of the case plan continued to be reunification of the children with their parents. Latoya's visitation with the children was to be

facilitated through Patchworks House, a neutral off-site location, under the highest level of supervision.

{¶7} On May 21, 2009, the case plan was amended to require Latoya to be at Patchworks House thirty minutes prior to her visits with the children and to suspend her visitation if she missed two or more visits. This change was made due to the fact that during the prior five visits, Latoya was forty-five minutes late to one, and missed the other four. The Agency also noted that Latoya had failed to comply with any of the objectives listed in the case plan. At this point in time, James had been recently released from jail on a felony non-support charge. While in jail, James completed parenting classes and some domestic violence classes. The Agency reserved filing a motion for permanent custody based in part on James reporting his interest in gaining custody of C.B. and J.C. However, James was now also required to have his visitation with the children be facilitated through Patchworks House under the highest level of supervision.

{¶8} On September 14, 2009, the magistrate entered a decision continuing the children's temporary custody with the Agency in foster care placement. Latoya was again incarcerated on pending criminal charges and her visitations with the children had been suspended due to her failing to attend previously scheduled visits. Latoya also showed no progress in meeting the objectives in the case plan. The magistrate's decision indicated that James had been visiting with

the children upon his prior release from jail, but was subsequently incarcerated again due to violating his probation by testing positive for drugs.

{¶9} On November 16, 2009, the Agency filed a motion requesting an order terminating its temporary custody of the children and placing them in temporary custody of Leslie Reynolds in a kinship placement. The children's placement with Ms. Reynolds was made at James' request when the Agency notified him of its intentions to seek permanent custody of the children. At this time, James was completing a court-ordered correctional based drug treatment program in Lucas County and Latoya continued to be incarcerated. The children's temporary placement with Leslie Reynolds was subsequently approved by the trial court and the Agency continued to have protective supervision over the placement.

{¶10} On March 10, 2010, an amendment to the case plan was filed modifying James visitation from unsupervised visits with the children to visits under the supervision of Leslie Reynolds or an appropriate off-site agency. The reason for the change in James' visitation was due to the fact that he took the children to a hotel to see Latoya, who had been recently released from prison, where all four of them spent two days together. This was done in violation of the case plan, which suspended Latoya's supervised visitation at a neutral off-site agency with the children due to her non-compliance with the case plan.

{¶11} On May 25, 2010, the Agency moved to have the children removed from Leslie Reynolds' custody. Ms. Reynolds informed the Agency that she was no longer interested in having the children placed with her due to concerns over the relationship between Latoya and James. After a shelter care hearing, the court approved the children's removal from Leslie Reynolds' home and again placed the children in the temporary custody of the Agency in foster care. Neither James nor Latoya was present at the hearing due to being incarcerated at the time. Specifically, Latoya was in jail pending a felony robbery charge and James was in jail on charges related to drug trafficking.[2]

{¶12} On August 2, 2010, James filed a motion for legal custody as a dispositional alternative requesting the children be placed in the temporary custody of their "paternal aunt," Kenisha White. In the meantime, Latoya had been sentenced to three years in prison for her robbery conviction, with her stated prison term ending in May 2013, and James was sentenced to an eight-month prison term for his conviction of trafficking in drugs.

{¶13} On August 27, 2010, the Agency filed a motion requesting permanent custody of the children and alleging that the children cannot be placed with either parent in a reasonable amount of time nor should they be returned to

---

[2] Latoya's robbery charge stemmed from an incident in which she was caught on video entering a gas station and demanding money from the clerk with her hand in her front pocket making it appear as if she had a gun. On July 22, 2010, Latoya pled guilty to the charge. On June 11, 2010, James pled guilty to trafficking in Marijuana.

either parent, and that it is in the best interest of the children for permanent custody to the Agency to be granted. *See* R.C. 2151.414(B)(1)(a), (E)(15).

{¶14} On October 12, 2010, the magistrate filed a decision permitting the Agency to arrange supervised visitations between Kenisha White and the children, and to have a home study completed of Ms. White's home. This was done in an effort to explore a possible kinship placement of the children with Ms. White.

{¶15} On December 1, 2010, the Agency dismissed its motion for permanent custody of the children filed on August 27, 2010 due to scheduling conflicts with the Guardian ad litem ("GAL") in the case and the Agency's inability to reschedule the permanent custody hearing within the statutory 200-day timeframe. The same day the Agency refiled its motion for permanent custody.

{¶16} On February 9, 2011, the GAL filed a report, in which she noted that Kenisha White could offer the children a potentially safe and permanent home, but expressed her concerns with the placement being suggested at the behest of James and Latoya instead of on Ms. White's initiative. On the same day, a hearing was held regarding the Agency's motion for permanent custody and James' motion for an order placing the children in the temporary custody of Kenisha White. At the hearing, James' counsel requested a continuance to allow for additional time to implement the kinship placement with Kenisha White. The GAL also indicated that a grant of additional time to explore the kinship placement with Ms. White

would be in the children's best interest. As a result, the court continued the proceedings on the Agency's motion for permanent custody to allow the children to begin to visit with Ms. White so that they could eventually be placed with her. James was provided with supervised visitation with the children at Patchworks House. Latoya continued to be incarcerated at this time. The parties agreed at the hearing that if the transition of placing the children with Kenisha White was not progressing successfully, the Agency would refile its motion for permanent custody.

{¶17} On April 29, 2011, the Agency refiled its motion for permanent custody of the children. Kenisha White was no longer committed to taking temporary custody of the children. Ms. White missed several scheduled visitations with the children and informed the ongoing caseworker that she had concerns about the children being placed in her home. It was later revealed that Ms. White is not actually related to James, despite the representations made to the court by the parents that Ms. White was the children's paternal aunt. During this time, James had not exercised any of his visitations with the children and had also refused to take a drug test. Latoya was still incarcerated and was denied judicial release.

{¶18} On June 10, 2011, the GAL filed a second report in the case. This time the GAL recommended the court grant the Agency's motion for permanent custody.

{¶19} On June 14 and 15, 2011, a hearing on the Agency's motion for permanent custody and James' motion for legal custody of Kenisha White as a dispositional alternative was held before the magistrate. Several witnesses testified, including the children's current foster mother, Tawana Craddolph, Latoya, the GAL, the ongoing caseworker, Jay Rishty, and Kenneth Kreais, a friend of Latoya's. James did not appear at the hearing. James' counsel made an oral motion to continue the proceedings in light of James' absence, which was overruled by the magistrate.

{¶20} On August 9, 2011, the magistrate issued a 31-page decision on the matter. Based on the evidence adduced at the hearing, the magistrate found that the children had been in the temporary custody of the Agency in excess of twelve months of a consecutive twenty-two-month period. *See* R.C. 2151.414(B)(1)(d). The magistrate also found that the evidence supported finding that the children cannot be placed with either parent within a reasonable time or should not be placed with either parent. *See* R.C. 2151.414(B)(1)(a).

{¶21} The magistrate found by clear and convincing evidence that the Agency had used reasonable efforts to reunite the children with the parents but

that the parents have failed to substantially comply with the case plans. The magistrate then concluded that based on the relevant statutory considerations, it was in the best interest of the children to be in the permanent custody of the Agency. Thus, the magistrate found by clear and convincing evidence that the Agency's motion for permanent custody should be granted, terminating Latoya's and James' parental rights.

{¶22} Both Latoya and James subsequently filed objections to the magistrate's decision. On January 6, 2012, the trial court specifically addressed and overruled each of Latoya's and James' objections to the magistrate's decision. The trial court found that the statutory and best interest findings of the magistrate were supported by the evidence in the record and approved the magistrate's decision. Thus, the trial court found that the Agency used reasonable efforts to reunite the children with their parents and granted the Agency's motion for permanent custody, terminating Latoya's and James' parental rights. James' motion for an order placing the children with Kenisha White was also dismissed.

{¶23} Latoya and James now appeal the trial court's decision, asserting the following assignments of error.

## LATOYA'S ASSIGNMENT OF ERROR NO. I

**THE COURT'S GRANT OF PERMANENT CUSTODY TO THE SENECA COUNTY DEPARTMENT OF JOB AND FAMILY SERVICES WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

**LATOYA'S ASSIGNMENT OF ERROR NO. II**

**THE TRIAL *[sic]* ERRORED *[sic]* BY NOT GRANTING APPELLANT/FATHER'S MOTION FOR CONTIUANCE *[sic]*.**

**LATOYA'S ASSIGNMENT OF ERROR NO. III**

**THE TRIAL COURT ERRED BY ADMITTING AND RELYING ON THE GUARDIAN AD LITEM REPORTS THAT CONTAINED UNDERLYING HEARSAY INFORMATION AND THAT WERE SUBMITTED OUTSIDE THE REQUIREMENTS OF THE SUPREME COURT SUPERINTENDENCE RULE 48 AND FOR NOT INSURING THE GUARDIAN AD LITEM WAS IN COMPLIANCE WITH THE SUPREME COURT SUPERINTENDENCE RULE 48.**

**LATOYA'S ASSIGNMENT OF ERROR NO. IV**

**THE TRIAL COURT ERRED BY FINDING THAT THE SENECA COUNTY DEPARTMENT OF JOB'S *[sic]* AND FAMILY SERVICES HAD MADE REASONABLE EFFORTS TO REUNIFY THE FAMILY.**

**JAMES' ASSIGNMENT OF ERROR NO. I**

**THE COURT ERRED IN ADMITTING AND RELYING ON THE GUARDIAN AD LITEM REPORTS THAT CONTAINED UNDERLYING HEARSAY INFORMATION, AND THAT WERE SUBMITTED OUTSIDE THE REQUIREMENTS OF THE SUPREME COURT SUPERINTENDENCE RULE 48.**

**JAMES' ASSIGNMENT OF ERROR NO. II**

**THE COURT BELOW ERRED IN AFFIRMING THE MAGISTRATE'S DENIAL OF A CONTINUANCE OF THE PERMANENT CUSTODY HEARING SO THAT THE FATHER COULD ATTEND THE HEARING AND PROVIDE EVIDENCE AND TESTIMONY.**

## JAMES' ASSIGNMENT OF ERROR NO. III

### THE FINDINGS AND CONCLUSIONS OF THE COURT BELOW WERE NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶24} Because Latoya's and James' assignments of error raise the same issues, we elect to discuss them together. Furthermore, for ease of discussion we will address the assignments of error out of order.

*Latoya's and James' Second Assignments of Error*

{¶25} In their second assignments of error, both Latoya and James argue that the trial court erred when it overruled their objections to the magistrate's decision denying the oral motion made by James' counsel to continue the permanent custody hearing because James was unavailable to attend the hearing.

{¶26} Juvenile Rule 23 provides that "[c]ontinuances shall be granted only when imperative to secure fair treatment for the parties." It is well-settled that "[t]he grant or denial of a continuance is a matter which is entrusted to the broad, sound discretion of the trial judge. An appellate court must not reverse the denial of a continuance unless there has been an abuse of discretion." *State v. Unger*, 67 Ohio St.2d 65, 67 (1981). An abuse of discretion implies that the court's attitude was unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶27} Nevertheless, the right of due process requires that "a defense counsel be afforded the reasonable opportunity to prepare his case." *State v. Sowders*, 4 Ohio St.3d 143 (1983). The Supreme Court of Ohio has recognized: " 'There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.' " *Unger* at 67 quoting *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841 (1964). The trial court may consider factors such as the length of the delay requested, prior requests for continuances, the inconvenience to the parties, witnesses, counsel, and the court, whether the movant contributed to the circumstances giving rise to the request for a continuance, and other relevant factors depending on the facts of the case. *State v. Landrum*, 53 Ohio St.3d 107 (1990).

{¶28} The magistrate in her decision stated the following with regard to the oral motion for a continuance made on James' behalf by his counsel.

> **Father, James Carswell, Sr., was not present and did not appear for either date [of the permanent custody hearing]. He is represented by counsel. [James' counsel] informed the court that Father contacted him on June 13, 2011 at 4:45 p.m. to inform [his counsel] that he was unable to make it to the hearing on June 14, 2011 as he was in Atlanta, Georgia. Father then stated that he was without transportation to make it from Toledo, Ohio to Tiffin, Ohio for the hearing, even though he had just told [his counsel] he was out of state. Father further stated to [his counsel] that he wanted the attorney that he spoke to [a]**

-14-

Case No. 13-12-06 and 13-12-07

> **few weeks ago to represent him in this matter. Finally he told him that he wanted a new attorney for these matters. [James' counsel] informed the court that he believed that the other attorney he spoke to was [J.C.'s attorney] in these matters.**
> * * *
> **Father gave three reasons for not being able to attend the hearing. The magistrate does not find any of the excuses reasonable. The first notice of these hearings was personally served on Father on February 2, 2011. The second notice for these hearing dates was sent to Father by certified mail on or about May 2, 2011 and [a] certified return receipt was filed by the court on May 6, 2011. Father has had more than enough time to make sure he was not out of state, had arranged and secured transportation, or seek another attorney to represent him in these matters.**

(Magistrate's Decision, Aug. 9, 2011, at p. 2).

{¶29} On appeal, neither James nor Latoya dispute the fact that James was properly served with notice of the permanent custody proceedings and that he had ample time to secure another attorney if he was dissatisfied with the one appointed to him. In fact, his own counsel on the record informed the court that he had called James two weeks prior to the permanent custody hearing to remind him of the hearings dates.

{¶30} James cites to *In re Edward M*., 6th Dist. Nos. L-04-1282, L-04-1304, 2005-Ohio-3354, in support of his position. However, in that case, the father-appellant did not appear at the permanent custody hearing because he was suddenly hospitalized. In reversing the decision of the trial court overruling father-appellant's motion for a continuance, the Sixth District noted that the

-15-

father's absence at the proceedings was through no fault of his own, he had always appeared for scheduled hearings, never before asked for a continuance and had attended all scheduled visits with the children except when he was hospitalized. Here, the record demonstrates that James consistently missed court hearings requiring his attorney to ask for multiple continuances due to James' absences, and that James failed to regularly exercise visitation with his children.

{¶31} Moreover, it is apparent from the record that James was continually represented by counsel throughout the custody proceedings with the Agency, despite the fact that James chose to not actively participate in the case. James never provided the court with a valid excuse for his lack of involvement in such a crucial court proceeding resulting in the termination of his parental rights. Accordingly, under the particular facts and circumstances presented in this case, we conclude that the trial court did not abuse its discretion in overruling the oral motion made by James' counsel to continue the permanent custody hearing. Latoya's and James' second assignments of error are overruled.

### *Latoya's Third Assignment of Error and James' First Assignment of Error*

{¶32} In these assignments of error, Latoya and James contend that the trial court erred when it overruled their objections to the magistrate's decision challenging the admissibility of the GAL's report. Latoya and James assert two reasons in support of their argument that the GAL's report was inadmissible.

First, they argue that the GAL did not comply with the guidelines established in Sup.R. 48 because she never observed James interact with the children. Second, they argue that the GAL report contains hearsay. However, neither parent identifies a specific portion of the report to contain hearsay, but instead simply makes a general assertion regarding the inadmissibility of the report.

{¶33} Initially, we note that neither Latoya nor James objected to the admissibility of the GAL's report at the permanent custody hearing. It is well established that if a party fails to object at the trial court level, that party waives all but plain error. "A 'plain error' is obvious and prejudicial although neither objected to nor affirmatively waived which, if permitted, would have a material adverse affect on the character and public confidence in judicial proceedings." *Schade v. Carnegie Body Co.*, 70 Ohio St.2d 207, 209 (1982). The Ohio Supreme Court has discussed the application of the plain error doctrine in civil cases, finding that, "[i]n appeals of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *Goldfuss v. Davidson*, 79 Ohio St.3d 116, syllabus (1997).

{¶34} Here, both Latoya and James were provided with a full and fair opportunity to cross-examine the GAL regarding her observations and findings at the permanent custody hearing. The record indicates that the GAL was assigned to the case in August of 2009 after replacing the original CASA assigned to the case. At the permanent custody hearing, the GAL testified that during the time she was on the case, she was unable to observe James interact with the children because James' visitation at Patchworks House was done prior to her taking over the case. However, she explained that she read the reports of her predecessor regarding James' visits which indicated that his visits went "wonderfully" and by all reports he was doing "remarkably well." (Trans. at 140, 146). The GAL also testified that she was hoping James "would do what he needed to do to get these kids." (Trans. at 140).

{¶35} The record indicates that James was able to get unsupervised visitation with the children and saw the children on a somewhat regular basis when they lived with Leslie Reynolds. However, the GAL testified that after the placement with Ms. Reynolds terminated and the children were returned to foster care, James failed to exercise visitation with the children partially due in part to being incarcerated during some of this time, but also due to his own lack of initiative. Specifically, the GAL noted that James had not seen the children since

March of 2010 and had neglected to set-up visitations since last being released from prison in early 2011.

**{¶36}** Finally, both the magistrate's decision and the judgment entry of the trial court granting permanent custody of the children to the Agency revealed that the magistrate's and trial court's reliance on the GAL's report was minimal. Rather, both cited to the evidence presented at the permanent custody hearing in addition to the extensive record in the case proceedings as the basis for their determinations.

**{¶37}** For all these reasons, we find that the magistrate did not commit plain error when it admitted the GAL's report into evidence. Likewise, we conclude that neither Latoya nor James suffered any prejudice as a result of the magistrate's and trial court's limited consideration of the GAL's report. Therefore, Latoya's third and James' first assignments of error are overruled.

### *Latoya's Fourth Assignment of Error*

**{¶38}** In her fourth assignment of error, Latoya contends that the trial court erred when it determined that the Agency used reasonable efforts to reunify the children with her.

**{¶39}** The Revised Code imposes a duty on the part of children services agencies to make reasonable efforts to reunite parents with their children where the agency has removed the children from the home. R.C. 2151.419; *see*, *also*, *In*

*re Brown*, 98 Ohio App.3d 337, 344 (1994). Further, the agency bears the burden of showing that it made reasonable efforts. R.C. 2151.419(A)(1). "Case plans are the tools that child protective service agencies use to facilitate the reunification of families who * * * have been temporarily separated." *In re Evans*, 3d Dist. No. 1–01–75, 2001–Ohio–2302. To that end, case plans establish individualized concerns and goals, along with the steps that the parties and the agency can take to achieve reunification. *Id.* Agencies have an affirmative duty to diligently pursue efforts to achieve the goals in the case plan. *Id.* "Nevertheless, the issue is not whether there was anything more that [the agency] could have done, but whether the [agency's] case planning and efforts were reasonable and diligent under the circumstances of this case." *In re Leveck*, 3d Dist. Nos. 5–02–52, 5–02–53, 5–02–54, 2003–Ohio–1269, ¶ 10.

{¶40} On appeal, Latoya points to the fact that she was incarcerated for the majority of the time the children were in the Agency's temporary custody and argues that the Agency failed to ensure she maintained reasonable contact and/or visitation with C.B. and J.C. In particular, Latoya claims that she was denied phone contact with C.B. and J.C. when she tried to call the children while they lived with Tawana Craddolph, the children's foster mother. Latoya also contends that the Agency failed to provide sufficient case plan services to her so that she could meet the objectives in the case plan.

{¶41} First, Latoya's claim that she was denied phone contact and/or visitation with her children while she was incarcerated is unsubstantiated by the record. Ms. Craddolph testified that she never denied Latoya phone contact with the children while they were in her care. Ms. Craddolph further testified that she only received one call from Latoya asking to speak to the children, at which point Latoya was able to talk to the children. Other than this one phone call, Ms. Craddolph explained that she had received calls from the prison but was not home at the time to accept the calls. Moreover, there is no indication in the record that Latoya ever petitioned the court to set up visitation with the children at the prison. However, the record does indicate that when Latoya was intermittently released from prison during the three years of the Agency's involvement, she only sporadically visited the children and frequently would not show for scheduled visitations, despite the Agency's efforts to facilitate her visitations.

{¶42} Second, the evidence at the permanent custody hearing revealed that the Agency made several attempts to assist Latoya with her drug addiction, which appeared to be a major obstacle in her ability to meet the objectives in the case plan. Specifically, Jay Rishty, the ongoing caseworker on the case, testified that the Agency helped get Latoya admitted into a rehabilitation facility, which cost the Agency $1,500.00. However, Latoya left the facility before completing the program. Mr. Rishty also arranged for Latoya to live at a homeless shelter, which

worked with a counseling center and would help Latoya meet some of the counseling requirements stated in the case plan. Latoya left the shelter two days later. In addition, Latoya continued to test positive on drug screens throughout the three years the Agency had temporary custody of her children.

{¶43} Based on the foregoing, we find that the Agency satisfied its duty to diligently pursue efforts to achieve the goals in the case plan. The Agency's case planning and efforts were reasonable and diligent under the circumstances of this case. It is evident that Latoya's failure to actively meet the objectives in the case plan was through no one's fault but her own. The record is replete with instances, in which the Agency attempted to assist Latoya with remedying the issues preventing her from reunifying with C.B. and J.C., but Latoya chose not to participate in removing those barriers. Therefore, we find that the magistrate and the trial court did not err when they determined that the Agency had made reasonable efforts to prevent the continued removal of the children from Latoya's home. Latoya's fourth assignment of error is overruled.

*Latoya's First Assignment of Error and James' Third Assignment of Error*

{¶44} In these assignments of error, Latoya and James claim that the findings and conclusions of the magistrate and the trial court granting permanent custody of C.B. and J.C. to the Agency were not supported by the manifest weight of the evidence.

{¶45} As an initial matter, we note that "[i]t is well recognized that the right to raise a child is an 'essential' and 'basic' civil right." *In re Franklin*, 3d Dist. Nos. 9–06–12, 9–06–13, 2006–Ohio–4841, ¶ 9, citing *In re Hayes*, 79 Ohio St.3d 46, 48 (1997). The Supreme Court of Ohio has held that a parent "must be afforded every procedural and substantive protection the law allows." *In re Hayes*, supra, quoting *In re Smith*, 77 Ohio App.3d 1, 16 (1991). Thus, it is with these constructs in mind that we proceed to determine whether the trial court erred in granting permanent custody of the children to the Agency.

{¶46} Section 2151.414(B)(1) of the Revised Code provides, *inter alia*, that a trial court:

> **may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:**
>
> **(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, * * * and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.**
>
> **(b) The child is abandoned.**
>
> **(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.**

**(d)   The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and * * * the child was previously in the temporary custody of an equivalent agency in another state.**

R.C. 2151.414(B)(1)(a-d) (emphasis added).

**{¶47}** The Supreme Court of Ohio has held that "[c]lear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 477 (1954). Further, "[i]t is intermediate; being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *Id*., citing *Merrick v. Ditzler*, 91 Ohio St. 256 (1915). In addition, when "the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Cross*, supra (citations omitted); *see*, *also*, *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985).

**{¶48}** At the outset, we note that Latoya and James do not dispute the finding of the magistrate and the trial court that the children have been in the Agency's temporary custody in excess of the required twelve or more months in a

consecutive twenty-two-month period. *See* R.C. 2151.414(B)(1)(d). In addition to the court finding a grant of permanent custody to the Agency is in the children's best interest, this finding without more provides the court with the appropriate grounds to grant the Agency's motion for permanent custody. However, the magistrate and the trial court made the additional finding that the children cannot be placed with either parent within a reasonable time or should not be placed with either parent. R.C. 2151.414(B)(1)(a). The assignments of error raised are related to this additional finding by the magistrate and the trial court, therefore, in the interest of justice we will address the arguments made regarding the adequacy of this specific finding.

{¶49} In regards to making a finding pursuant to R.C. 2151.414(B)(1)(a) that the children cannot be placed with either parent within a reasonable time or should not be placed with either parent, the Revised Code states as follows:

> **(E) In determining at a hearing held pursuant to division (A) of this section * * * whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section * * * *that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent***:
>
> **(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the**

**problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.**

**\* \* \***

**(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;**

**\* \* \***

**(12) The parent is incarcerated at the time of the filing of the motion for permanent custody or the dispositional hearing of the child and will not be available to care for the child for at least eighteen months after the filing of the motion for permanent custody or the dispositional hearing.**

**(13) The parent is repeatedly incarcerated, and the repeated incarceration prevents the parent from providing care for the child.**

**\* \* \***

**(16) Any other factor the court considers relevant.**

R.C. 2151.414(E) (emphasis added).

**{¶50}** On appeal, Latoya and James contend that the evidence at the permanent custody hearing was insufficient for the magistrate and the trial court to

-26-

conclude that they have demonstrated a lack of commitment toward their children by failing to regularly support, visit, or communicate with their children when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the children. *See* R.C. 2151.414(E)(4). Notably, neither Latoya nor James dispute the fact that their repeated incarceration during the three-year period of the Agency's involvement prevented them from providing care for C.B. and J.C. *See* R.C. 2151.414(E)(13).

{¶51} Specifically with regard to her arguments on appeal, Latoya contends that the evidence at the permanent custody hearing establishes that, while she has been incarcerated, she has successfully completed substance abuse programs, "family responsibility" programs, and participated in an anxiety group that addresses mental health related issues. Latoya also asserts that the evidence at the hearing demonstrates she has filed a second motion for judicial release and is hopeful that it will be granted. Furthermore, Latoya points to the testimony provided at the hearing by her friend Kenneth Kreais, in which Mr. Kreais confirmed that Latoya and the children can stay with him at his home upon Latoya's release from prison. Latoya claims this evidence proves her commitment to her children in that she is now actively working toward some of the objectives in the case plan and that if she is given an additional six months before the trial

court ruled on the Agency's permanent custody motion, then she will hopefully be released from prison and able to provide the children with stable housing.

**{¶52}** Despite Latoya's contentions, there is an overwhelming amount of evidence in the record to support the findings of the magistrate and the trial court on this issue. The record demonstrates that Latoya was given ample opportunity to complete the minimal objectives in the case plan in order to regain custody of her children, but that she chose not to take the initiative to accomplish these tasks during the limited intervals of time that she was released from prison.

**{¶53}** For instance, Latoya consistently failed to exercise visitation with her children in accordance with the case plan. In fact, Jay Rishty, the ongoing caseworker in the case, testified that Latoya would either arrive late to visitations at Patchwork House or not show up at all. Mr. Rishty testified that this was having a noticeably harmful effect on the children. As a result, the Agency would not take the children to Patchwork House for Latoya's visits unless Latoya had called 24-hours in advance to confirm she would be there. This procedure was implemented because the disappointment of waiting for Latoya to arrive to the visitations and then have her not show was becoming too much for the children to handle. Moreover, Latoya admitted at the permanent custody hearing that her visitations with the children were sporadic and that she had missed visits. The last

time Latoya saw C.B. and J.C. was in March of 2010 when James violated the case plan and took the children to see Latoya at a hotel in Toledo.

{¶54} At the permanent custody hearing, Latoya also admitted to using drugs during her intermittent releases from prison. Latoya explained that her drug use contributed to her not taking seriously the case plan and the Agency's involvement with the custody of C.B. and J.C. Latoya testified that it is difficult for her to stay clean and sober when she is not incarcerated. Latoya further admitted that it has only been in the last year, during her most recent incarceration, that she has begun to take steps to meet the objectives in the case plan. Mr. Rishty confirmed that Latoya loses control of her life when she is not in prison. Specifically, he testified that during the past three years, a pattern has emerged in Latoya's behavior that upon her release from prison she returns to her chronic drug abuse and unstable housing, which consists of her living in various hotels.

{¶55} Finally, Latoya's assertion of her impending early release from prison is purely speculative. The record demonstrates that her stated prison term expires in May 2013 and there is no indication that Latoya's motion for judicial release has been granted. In addition, Kenneth Kreais did testify that Latoya and the children could stay with him upon Latoya's release from prison. However, Mr. Kreais stated that it would only be on a temporary basis, for weeks or maybe

months, but that he would not provide a permanent solution to Latoya's repeated inability of providing stable housing for the children.

{¶56} As for his part, James argues on appeal that the record demonstrates that he has made efforts to maintain custody of C.B. and J.C. and has attempted to meet the objectives of the case plan. In addition, James points to the two kinship placements he requested the Agency to explore as evidence of his commitment to his children.

{¶57} At the outset, we note that even though James had arranged for the children to be placed in the temporary custody of "relatives" under the Agency's protective supervision, there was no evidence that either Leslie Reynolds or Kenisha White were actual blood relatives of James or the children, as James represented to the court. In fact, it appears from the testimony at the permanent custody hearing that Ms. Reynolds had a personal relationship with James and was only willing to take custody of the children if Latoya remained out of the picture. However, upon Latoya's previous release from jail in 2010, Ms. Reynolds lost interest in having custody of the children and the "kinship" placement fell apart. As for Kenisha White, the record establishes that she never took the initiative to set up the "kinship" placement and ultimately told the Agency that she was not interested in having temporary custody of the children. Thus, James' suggested

"kinship" placements did not provide adequate alternatives to the children's permanent custody with the Agency.

**{¶58}** In addition, the testimony at the permanent custody hearing establishes that James had the potential to be a good father to the children, but that he lacked initiative and follow through when it came to doing the work to regain custody of C.B. and J.C. Although not to the same extent as Latoya, James was intermittently incarcerated during the three years of the Agency's involvement with the children. However, unlike Latoya, James had more free time during the three year period, when he was not incarcerated, to establish consistent visitations with C.B. and J.C. but chose not to do so. Furthermore, at no point in time during these proceedings was James able to provide stable housing for the children. He lived in Toledo with his aunt, who made it clear that she did not want to be involved with the children's custody. Moreover, the record is replete with instances in which James failed to appear at pertinent hearings during this case, including the permanent custody hearing which was James' last opportunity to present evidence demonstrating why the Agency's motion for permanent custody should not be granted.

**{¶59}** Mr. Rishty, the ongoing caseworker, testified that "we have now been on this case for three years. The parents are in no better position, in fact, they are in a worse position now to take custody of their children." (Trans. at

166). The record of these proceedings and the evidence elicited at the permanent custody hearing supports this conclusion. Thus, we find that the determination of both the magistrate and the trial court that Latoya and James demonstrated a lack of commitment toward their children by failing to regularly support, visit, or communicate with their children when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the children was supported by clear and convincing evidence. Accordingly, we conclude that the magistrate's and the trial court's determinations that the children cannot be placed with either Latoya or James within a reasonable period of time or should not be placed with them were not against the manifest weight of the evidence.

{¶60} Although we conclude that the findings of the magistrate and the trial court regarding R.C. 2151.414(B)(1)(a) were not against the manifest weight of the evidence, before granting permanent custody of C.B. and J.C. to the Agency, the magistrate and the trial court also had to find that granting permanent custody to the Agency was in the children's best interest. Latoya and James contend that the magistrate and the trial court erred in finding permanent custody is in the children's best interest and that the decisions were against the manifest weight of the evidence.

{¶61} In order to determine whether granting permanent custody to an agency is in a child's best interest, the court must consider all relevant factors,

including, but not limited to, five enumerated factors listed in R.C. 2151.414(D).

These factors are:

> **(1) The interaction and interrelationship of the child with the child's parent, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;**
>
> **(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;**
>
> **(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two month period * * *;**
>
> **(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and**
>
> **(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.**

{¶62} On appeal, Latoya and James argue that the magistrate and the trial court overlooked the strong bonds the children have with their half-siblings and relatives in their determinations that granting permanent custody of the children to the Agency is in their best interest. *See* R.C. 2151.414(D)(1).

{¶63} The evidence in the record of the children's relationships with their half-siblings and relatives is limited. At the time of the permanent custody hearing C.B. and J.C. had spent two-thirds of their short lives in the Agency's temporary custody. C.B was barely two-years-old when the Agency became involved and

-33-

J.C. was almost ten-months old. The children had not seen their maternal grandmother since 2009 and their maternal half-sister had moved to Chicago to live with her father. Tawana Craddolph, the children's foster mother and the only consistent parental figure in their lives, testified that the children had seen their paternal half-siblings once at a birthday party and that James was unaware that C.B. and J.C. visited with his other children. Ms. Craddolph also testified that the children have learned to be reserved about whom they identify as their "family" and truly only consider each other their "family."

{¶64} In contrast, there was ample evidence presented at the permanent custody hearing demonstrating that the lack of permanency in the children's living situation and the constant roller coaster of being shuffled from one person's home to another, which was done at Latoya's and James' requests, were beginning to have a detrimental effect on them. *See* R.C. 2151.414(D)(4). Ms. Craddolph explained that C.B. and J.C. "need some permanency in their [lives]. They don't need to keep going to cousins, aunties, whoever and—because when they keep doing that then they get returned back to the agency, that's like a fall for them to say, "Where do I belong?" You know, it's like a scab being opened constantly to them, that there's no healing right now for it so." (Trans. at 38). Both the ongoing caseworker and the GAL assigned to the case echoed similar sentiments about the children's need for a permanent home. Specifically, the GAL testified that the

children have begun to exhibit behavior and attachment issues, and that it has been recommended that they seek counseling to address these problems. The GAL explained she believed that once the children were in a "forever home" they would flourish.

{¶65} Based on the evidence in the record, we conclude that the determinations of the magistrate and the trial court that it is in the best interest of the children to grant permanent custody to the Agency were supported by clear and convincing evidence and were not against the manifest weight of the evidence. Therefore, Latoya's first and James' third assignments of error are overruled.

{¶66} For all these reasons, the judgments of the Seneca County Court of Common Pleas, Juvenile Division, are affirmed.

***Judgments Affirmed***

**PRESTON and ROGERS, J.J., concur.**

**/jlr**