[Cite as *In re A.T.*, 2020-Ohio-2781.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## CRAWFORD COUNTY

IN RE:

A.T.,

ADJUDGED DEPENDENT CHILD.

[NICOLE TEMPLE - APPELLANT]

CASE NO. 3-19-13

**O P I N I O N**

IN RE:

G.S.,

ADJUDGED DEPENDENT CHILD.

[NICOLE TEMPLE - APPELLANT]

CASE NO. 3-19-14

**O P I N I O N**

IN RE:

M.T.,

ADJUDGED DEPENDENT CHILD.

[NICOLE TEMPLE - APPELLANT]

CASE NO. 3-19-15

**O P I N I O N**

**Appeal from Crawford County Common Pleas Court**
**Juvenile Division**
**Trial Court Nos. F2195063, F2195064 and F2195065**

**Judgments Affirmed**

**Date of Decision: May 4, 2020**

APPEARANCES:

*Tani L. Eyer* **for Appellant**

*Geoffrey L. Stoll* **Guardian Ad Litem/Appellee**

---

**WILLAMOWSKI, J.**

{¶1} Appellant Nicole Temple ("Temple") appeals the judgments of the Juvenile Division of the Crawford County Court of Common Pleas, challenging the trial court's decision to award permanent custody of A.T., G.S., and M.T. to Crawford County Job and Family Services ("CCJFS"). For the reasons set forth below, the judgments of the trial court are affirmed.

*Facts and Procedural History*

{¶2} Temple is the mother of A.T., G.S., and M.T. Tr. 51. In 2017, one of her children had a blood test that revealed high levels of lead were in her system. Tr. 52. Doc. A12, B18, C16. An inspector came to Temple's house on West Warren Street ("West Warren House") to perform tests and found lead present throughout her home. Tr. 54. Temple owned the West Warren House but moved to her friend's mother's house on Irving Street ("Irving Street House") after finding that the West Warren House had unsafe levels of lead. Tr. 33, 54. While she and her children were living at the Irving Street House, her oldest child, A.T., missed three months of school and had to be held back one year. Tr. 37, 57. Temple explained that A.T.

was truant because she had trouble enrolling A.T. in a school district after they moved. Tr. 71.

{¶3} On June 28, 2017, CCJFS filed a motion for temporary custody of the children, citing deplorable home conditions. Doc. A1, B1, C1. At this time, Temple agreed that the children were not safe in her home and that they were dependent children. Tr. 67. On August 14, 2017, the trial court issued a judgment entry in which it determined that A.T., G.S., and M.T. were dependent children. Doc. A8, B10, C8. The trial court then awarded temporary custody of the children to CCJFS and approved CCJFS's case plan. Doc. A8, B10, C8.

{¶4} The case plan developed by CCJFS identified several concerns, which included Temple's mental health and the condition of her house. Doc. A8, B10, C8. The case plan noted that Temple's home tested positive for lead; was infested with bedbugs, roaches, and fleas; had a bathroom with a hole in the floor; and had animal feces spread across floors in multiple rooms. Doc. A8, B10, C8. In addition to attending parenting classes and obtaining a mental health assessment, the case plan directed Temple to "have the lead removed from her home"; to "maintain employment for a minimum of 3 months"; and to maintain her "home * * * free from hazards, such as feces, trash, roaches, bed bugs, and excessive amounts of clutter, for a minimum of 3 months." Doc. A8, B10, C8.

{¶5} After her children were placed into foster care, Temple moved back into her West Warren House because she wanted to "get it fixed up." Tr. 59. At this

time, she was working at Whirlpool. Tr. 56. She stated that she "had a breakdown on the line" and was told that she needed "to take stress medical leave * * *." Tr. 56. She said that she attempted to return to work after one month of leave but her medical leave had been denied. Tr. 57. After hearing that her leave had been denied, Temple quit her job. Tr. 57. She then purchased a trailer in New Bloomington ("New Bloomington Trailer"). Tr. 59. The New Bloomington Trailer was not initially approved by CCJFS. Tr. 59-60.

{¶6} After a visit in November, CCJFS reported that Temple's home had animal feces spread across the floor. Doc. A12, B18, C16. CCJFS reported that, while Temple had moved to the New Bloomington Trailer, she was staying with a friend in December because her pipes had frozen. Doc. A12, A19, B18, C16. In their semiannual report, CCJFS stated that Temple had not yet started working towards her three-month, stable housing goal by the middle of December 2017. Doc. A12, B18, C16. Further, after Temple quit her job at Whirlpool, she reported to CCJFS that she obtained a job at Trans Global. Doc. A12, B10, C16. However, CCJFS was not able to verify her employment at Trans Global. Doc. A12, B10, C16. Temple then reported to CCJFS that she was about to start a new job through Spherion Staffing. Doc. A12, B18, C16.

{¶7} In early 2018, a caseworker went to Temple's residence and observed animal feces on the floor. Doc. A15, B21, C19. Temple eventually removed the feces. Doc. A15, B21, C19. On February 28, 2018, CCJFS approved the New

Bloomington Trailer for visitation after Temple had improved the premises. Doc. A15, B21, C19. In March and April, the caseworker reported that Temple's home was "clean, sanitary, and appropriate." Doc. A15, B21, C19. Around this time, Temple progressed to weekend visitation with her children. Tr. 60.

{¶8} However, the children were found to have lice in their hair after two separate visits with Temple. Doc. A15, B21, C19. On May 6, 2018, after the second of these visits, CCJFS informed Temple that she would have to obtain a lice and nit free slip from the DOH before visitation could resume. Doc. A15, B21, C19. Temple testified that she hired an exterminator to inspect her New Bloomington Trailer and that the exterminator did not find evidence of an infestation. Tr. 65. Visitation resumed in June of 2018 after Temple presented a lice free slip to CCJFS. Doc. A15, B21, C19.

{¶9} During this timeframe, Temple obtained employment at Graphic Packaging. Tr. 60. She testified that she had to take a leave of roughly three months from this job because she was struck by a car while she was riding her bike and needed to have a surgical procedure performed. Tr. 60. Doc. A15, B10, C21. Temple explained that she would eventually quit her job at Graphic Packaging because her employer would not give her several days of leave to be with G.S., who had a medical procedure scheduled. Tr. 61.

{¶10} On June 27, 2018, CCJFS filed a motion requesting an extension of temporary custody. Doc. A14, B21, C18. On August 23, 2018, the trial court issued

a judgment entry that extended its prior award of temporary custody to CCJFS. Doc. A19, B23, C21. Temple agreed to the case plan amendment presented to the trial court at this time. Doc. A19, B23, C21.

{¶11} Subsequently, Temple moved to a trailer in Waterford Glen ("Waterford Glen Trailer") after she got a job at I.B. Tech. Tr. 60-61. She stated that she moved into the Waterford Glen Trailer because her driver's license had been suspended for speeding and she could not walk to work from her New Bloomington Trailer. Tr. 61, 75. However, CCJFS indicated that Temple had been evicted from her New Bloomington Trailer. Tr. 47. Temple denied being evicted from the New Bloomington Trailer, saying that she left of her own free will. Tr. 61.

{¶12} CCJFS reported that it had approved the Waterford Glenn Trailer for visitation in September of 2018. Doc. A21, B25, C23. The children returned from visits with Temple at the Waterford Glen Trailer with lice and nits. Doc. A21, B25, C23. There were also concerns about bedbugs in Temple's housing at this time. Doc. A21, B25, C23. CCJFS requested that Temple obtain a lice free slip and noted, in its semiannual review, that she took two months to acquire this documentation. Doc. A21, B25, C23. Temple testified that CCJFS informed her that they were concerned that she might have an insect infestation in her residence and that her children were returning to their foster home with bug bites. Tr. 62. CCJFS also reported that Temple hired an exterminator who did not find any evidence of bedbugs in her residence. Doc. A21, B25, C23.

{¶13} Temple testified that she lived in the Waterford Glen Trailer for about three months. Tr. 62. She stated that she decided to move back into her West Warren House after she was informed by CCJFS that her three-month housing timeline would have to be restarted due to the insect infestation issue. Tr. 62. Temple said that she thought she "might as well live on Warren" because "it was pretty much done." Tr. 62. CCJFS, however, reported that Temple had been evicted from the Waterford Glen Trailer. Tr. 47.

{¶14} Upon hearing that Temple had moved back into the West Warren House, CCJFS contacted the Department of Health ("DOH") regarding the order to vacate posted at that location. Judgment Entry, Semiannual Administrative Review Summary June 18, 2019. DOH informed CCJFS that no one was "supposed to be living in that residence under any circumstances." *Id*. CCJFS reported that, under an agreement between Temple and the DOH, Temple was permitted to work in the house to remove the lead but was not permitted to live in those premises. *Id*.

{¶15} CCJFS stated that, by June of 2019, the West Warren House had not had a lead inspection to determine the safety of living there. *Id*. Since there was still an order to vacate from the DOH posted on the front door of the West Warren House, CCJFS did not approve this residence. Ex. B. Further, CCJFS stated that the house was found to contain animal feces during each of their visits. Judgment Entry Semiannual Administrative Review Summary June 18, 2019. CCJFS again noted that the presence of lice and fleas in Temple's house was a recurring concern.

*Id.* Temple, however, testified that a person at the DOH had informed her that she was allowed to live in the West Warren House and that the DOH order only applied to pregnant women and children under the age of nine. Tr. 71. *But see* Ex. B.

{¶16} By this time, Temple had quit her job at I.B. Tech. Tr. 72. She testified that she was "burnt out from factories" and that she "was missing a lot of work." Tr. 73. She explained that she was absent from work because she "was involved in a lot of Court stuff * * *." Tr. 73. In addition to the child custody cases with CCJFS, Temple was subject to criminal charges that arose from maintenance violations for the outside condition of her West Warren House. Tr. 73.

{¶17} On January 10, 2019, CCJFS filed a second motion requesting an extension of temporary custody. Doc. A22, B26, C24. On March 13, 2019, the trial court again extended the award of temporary custody to CCJFS. Doc. A25, B31, C30. The trial court stated, in its judgment entry, "that all parties are in agreement that clear and convincing evidence exists that it would be in the best interests of the child[ren]" to extend the grant of temporary custody to CCJFS. Doc. A25, B31, C30.

{¶18} After a period of unemployment, Temple began working jobs at McDonald's and at United Dairy Farmers ("UDF"). Tr. 66, 77. She started to pay child support when she began working at UDF and had not regularly paid child support prior to this time. Tr. 77-78. Temple testified that she thought child support

was being withheld from her paycheck and was unaware that she was not paying child support prior to working at UDF. Tr. 78, 83.

{¶19} On April 19, 2019, the children's guardian ad litem ("GAL") filed a motion for permanent custody. Motion for Permanent Custody April 19, 2019. In July of 2019, Temple produced verification that her home had been inspected and was lead free. Tr. 43. On September 26, 2019, the trial court held a hearing on the motion for permanent custody. Tr. 4. At this hearing, Mitchell Weber ("Weber"), who was a caseworker with CCJFS, and Temple testified. Tr. 7, 57. On October 8, 2019, the trial court issued an order that granted permanent custody of A.T., M.T., and G.S. to CCJFS. Judgment Entry October 8, 2019.

{¶20} The appellant filed her notices of appeal on November 1, 2019. Doc. B18. On appeal, Temple raises the following assignments of error:

**First Assignment of Error**

**The trial court's decision was against the manifest weight of the evidence because the evidence did not support a finding that children services provided reasonable case planning and diligent efforts to assist the mother to remedy the conditions that initially caused the removal of the minor children from the home.**

**Second Assignment of Error**

**Clear and convincing evidence did not exist to justify a finding that the children should not be placed with either parent.**

In her first assignment of error, Temple argues that the factor listed in R.C. 2151.414(E)(1) is not applicable in this case.[1]  In her second assignment of error, she argues that R.C. 2151.414(B)(1)(a) and R.C. 2151.414(E)(4) are not applicable in this case.  However, a finding under R.C. 2151.414(B)(1)(a) relies upon a finding under R.C. 2151.414(E).  *In re A.F.*, 3d Dist. Marion No. 9-11-27, 2012-Ohio-1137, ¶ 54.  Since these two analyses are linked, we will consider both of these assignments of error in one analysis.

*First and Second Assignments of Error*

{¶21} Temple argues that the trial court's award of permanent custody to CCJFS was against the manifest weight of the evidence.  Specifically, she asserts that the trial court erred in determining that the children could not be placed with her in a reasonable amount of time as CCJFS did not, through reasonable case planning or diligent efforts, assist her in remedying the conditions that caused the removal of the children from her home.

*Legal Standard*

{¶22} The Supreme Court of Ohio has held that a guardian ad litem may file a motion for permanent custody.  *In re C.T.*, 119 Ohio St.3d 494, 2008-Ohio-4570,

---

[1] While text of the argument under this assignment of error concludes by mentioning family reunification in passing, the wording of the assignment of error and the thrust of the corresponding argument addresses whether R.C. 2151.141(E)(1) is applicable in this case.  The Appellant's Brief mentions R.C. 2151.414(E)(1) and relies on the language from that statute.  Appellant's Brief, 10.  Since this assignment of error clearly addresses the applicability of R.C. 2151.414(E)(1), we will not address the issue of family reunification even though these words are used at the conclusion of the argument under this assignment of error.

895 N.E.2d 527, ¶ 18, citing R.C. 2151.415(F) and R.C. 2151.281(I).[2] "When considering a motion for permanent custody of a child, the trial court must comply with the statutory requirements set forth in R.C. 2151.414." *In re A.M.*, 3d Dist. Marion No. 9-14-46, 2015-Ohio-2740, ¶ 13. R.C. 2151.414(B)(1) reads, in its relevant part, as follows:

> **(B)(1) * * * [T]he court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:**
>
> **(a) * * * [T]he child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.**

R.C. 2151.414(B)(1)(a).

{¶23} "In determining whether R.C. 2151.414(B)(1)(a) applies, the trial court must consider the factors enumerated in R.C. 2151.414(E)." *In re A.F.*, *supra*, at ¶ 54.

> **If one or more of the factors enumerated in R.C. 2151.414(E) is found to be present by clear and convincing evidence, the trial court shall find that the child cannot be placed with the parents within a reasonable period of time or should not be placed with the parents.**

---

[2] Although there is no express statutory authority for a GAL to file a motion for permanent custody, the Supreme Court of Ohio has nonetheless held that GALs have the authority to file a motion for permanent custody. *In re C.T., supra,* at ¶ 18. However, a GAL is an agent of the trial court. *In re Alfrey*, 2d Dist. Clark No. 01CA0083, 2003-Ohio-608, ¶ 16. Interestingly, the effect of this process is that, when a GAL files a motion for permanent custody, the trial court ultimately rules on a motion that its own agent filed.

*Id*. R.C. 2151.414(E) reads, in its relevant parts, as follows:

> **(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.**

> **(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;**

R.C. 2151.414(E)(1).

> **Upon review, an appellate court 'must examine the record and determine if the trier of fact had sufficient evidence before it to satisfy this burden of proof.' 'A reviewing court will not reverse a trial court's determination unless it is not supported by clear and convincing evidence.'**

(Citations omitted.) *In re A.M.*, *supra*, at ¶ 16, quoting *In re H.M.K.*, *supra*, at ¶ 43.

> **Clear and convincing evidence is more than a preponderance of the evidence but not as much evidence as required to establish guilt beyond a reasonable doubt as in a criminal case; rather, it is evidence which provides the trier of fact with a firm belief or conviction as to the facts sought to be established.**

*In re A.M.* at ¶ 16, quoting *In re H.M.K.* at ¶ 42.

*Legal Analysis*

{¶24} In this case, the trial court found that the children could not be placed with Temple in a reasonable amount of time (*See* R.C. 2151.414(B)(1)(a)) because Temple failed to substantially remedy the conditions that led to the children's removal (*See* R.C. 2151.414(E)(1)). Temple's main argument is that R.C. 2151.414(E)(1) does not apply to this case because she remedied the conditions that led to the removal of the children from her home and because CCJFS did not engage in reasonable case planning or make diligent efforts to help her remedy these conditions. *See* R.C. 2151.414(E)(1).

{¶25} The initial case plan from CCJFS listed several objectives: (1) completing a mental health assessment; (2) completing parenting classes; (3) verifying that a lead abatement process had been completed in her home; (4) maintaining employment for a minimum of three months; and (5) maintaining her "home * * * free from hazards, such as feces, trash, roaches, bed bugs, and excessive amounts of clutter, for a minimum of 3 months." Doc. A8, B10, C8. *See* Judgment Entry October 8, 2019. We will consider these five main objectives in turn.

{¶26} First, CCJFS made a referral for Temple's mental health assessment. Tr. 31-32. Temple completed a mental health assessment on July 11, 2017. Doc. A12, B18, C16. This initial assessment resulted in a recommendation that Temple continue with counseling. Doc. A12, B18, C16. However, Temple terminated counseling on November 6, 2017, saying that she did not need these services. Doc.

A12, B18, C16. After CCJFS informed her that she needed to complete counseling, Temple again went to take a mental health intake assessment in February of 2018 where she was again recommended for counseling. Doc. A15, B21, C16. At her first appointment, she was told that she did not need to engage in further counseling. Tr. 45. Doc. A12, A15, B18, B21, C16, C19. Thus, this objective had been completed by the time that the motion for permanent custody was filed in April of 2019.

{¶27} Second, CCJFS referred Temple to parenting classes. Tr. 31-32. In its initial case plan, CCJFS identified disciplinary practices as a parenting issue. Doc. A8, B10, C8. Further, A.T., who was almost the age of seven at the time that the motion for temporary custody was filed, reported babysitting her two younger siblings. Doc. A8. A.T. also had to be held back one year at school because she was truant from school for three months. Tr. 37, 57, 71. CCJFS provided referrals to Temple for parenting classes. Tr. 31-32. The record indicates that Temple attended the recommended parenting classes. Tr. 12. Doc. A15, B21, C16. Accordingly, the trial court found that Temple completed this objective. Judgment Entry October 8, 2019.

{¶28} Third, as to the lead abatement issue, Temple argues that CCJFS did not assist her in this process. Temple testified that CCJFS did not offer to help her to pay for the costs of lead abatement; did not provide a list of places that could offer her financial assistance; or provide financial assistance in paying for her home

to be inspected. Tr. 63. She testified that she did ask CCJFS for a list of places that might offer financial assistance for the lead abatement process but that CCJFS did not provide her with any referrals. Tr. 64. She stated that she personally worked to remove the lead hazard from her home with the help of a friend who was a contractor. Tr. 63. She testified that the lead abatement process took a long time because she could not afford the $700.00 lead test fee or the $400.00 certification fee. Tr. 63. She further testified that she had been working on the West Warren House since the DOH's order to vacate had been posted. Tr. 64.

{¶29} Weber testified that he personally did not make any referrals for lead abatement services or for grants that would assist in paying for these services. Tr. 31. However, he was not the original caseworker assigned to this case and did not know whether his predecessor made any such referrals. Tr. 10, 31. Weber also indicated that, while CCJFS did not offer to pay for the lead abatement process, it was not customary for CCJFS to pay for such services. Tr. 48. Weber was in contact with the DOH. Tr. 33. He stated that the DOH was the entity through which grants for lead abatement were available. Tr. 33. He also said that one of the reasons that there was not more assistance with the process of lead abatement was the fact that Temple had moved out of the West Warren House. Tr. 32.

{¶30} In this case, the motion for temporary custody was filed in June of 2017, and Temple submitted verification of lead abatement to the trial court in July of 2019. Tr. 43. Thus, nearly twenty-five months had passed in between these two

events. Weber testified that the longest that CCJFS can work with a family is two years. Tr. 15. While this objective was not completed by the time that the motion for permanent custody was filed, it was completed by the time of the hearing on the motion for permanent custody. Tr. 43.

{¶31} After hearing this testimony, the trial court stated the following about the lead abatement issue:

> **the agency clearly advised mother that this is something that is within the control of the health department and not them and that the health department are the gate-keepers for approved lead abatement contractors and the monetary assistance for completion of same and all of that was clearly provided to mother by the agency. It would be obvious the person in control of the premises needs to make the contacts for the monetary grant and with the people who would perform the abatement process.**

Judgment Entry October 8, 2019. Further, while the trial court recognized that Temple had ultimately completed the objective of lead abatement, the trial court nonetheless found that "[i]t [was] problematic that it took two years to remedy" this hazard. Judgment Entry October 8, 2019.

{¶32} Fourth, as to the objective of maintaining stable employment, Temple admitted that she had five jobs in the past two years and that she had quit three of these jobs. Tr. 72. Temple also testified that her driver's license had been suspended for speeding violations and that she had to walk to work at various times during the course of this case. Tr. 61, 75-76. She testified that her license had not

yet been reinstated and that she had to take a driving safety class in another month. Tr. 76.

{¶33} After considering this testimony, the trial court, in its judgment entry, found that Temple

> **reported that in these preceding twenty-seven (27) months she has had five jobs and voluntarily quit three of them. She testified that there [were] only brief periods that she was unemployed. For the preceding four months she has been working two jobs at McDonald's and United Dairy Farmers. Her contribution towards the support of the children despite the record of gainful employment has been sporadic * * *.**

Judgment Entry October 8, 2019, citing Ex. 1. Thus, by the time of the hearing on the motion for permanent custody, Temple had maintained employment at McDonald's and UDF for roughly four months. *Id.*

{¶34} Fifth, as to the objective of maintaining her home in a clean and sanitary home condition, Temple argues that she remedied the initial issue that led to removal by completing the lead abatement process. However, Weber testified that CCJFS's concerns were not limited to the presence of lead in Temple's house. Tr. 13. Weber stated that the presence of lead in Temple's house was the initial reason for CCJFS's intervention but that "the biggest concern was the condition of the house." Tr. 42. He said that Temple's house was in a deplorable condition at the time that the children were placed with CCJFS. Tr. 42. In addition to the presence of animal feces spread across the floors of Temple's house, there were issues with bedbug, cockroach, flea, and lice infestations. Tr. 13, 41-42.

-17-

**{¶35}** Weber had performed evaluations of Temple's housing. Tr. 42, 47. Within one month of the hearing on the motion for permanent custody, Weber visited Temple's house and reported having roughly thirty fleas on his leg after leaving. Tr. 42. He concluded that Temple has not been able to address the issue of flea or lice infestations in two years. Tr. 42. Weber stated that, in the time that he has been working on this case, Temple had been evicted from three houses and that this "would be considered unstable, not being able to keep a home for a matter of time." Tr. 47.

**{¶36}** Weber testified that CCJFS had a stock of various insecticides that are made available to those involved in their cases. Tr. 37. He stated that he provided Temple with insecticides on at least one occasion and that she may have availed herself of this stock prior to his time on her case. Tr. 37. He did, however, indicate that CCJFS did not provide Temple with any treatments to address the lice infestation and that Temple was expected to go through the DOH to verify that the lice infestation had been rectified. Tr. 36. These lice infestations interfered with the visitation that CCJFS was facilitating between Temple and her children at her residence. Tr. 35.

**{¶37}** Temple disputed having an ongoing issue with insect infestations. Tr. 75. She admitted that there were "a couple of periods" in which there were fleas in her house but said that "[a]ll pets have fleas." Tr. 74. She also stated that she began to keep her dogs outside because the "fleas * * * had gotten so bad * * *." Tr. 65.

Temple testified that she received bug bombs from CCJFS on one occasion. Tr. 65. She stated that, when she was at New Bloomington Trailer, the exterminator found no evidence of an infestation. Tr. 65. CCJFS also reported that an exterminator did not find evidence of bed bugs after one inspection at her Waterford Glen Trailer. Doc. A21, B25, C23.

{¶38} Temple also stated that she has treated her West Warren House for bugs and that CCJFS had not been back to her residence in the two weeks preceding the hearing on the motion for permanent custody. Tr. 65, 68. She said that, since moving back into the West Warren House, she has used bug bombs, indoor sprays, outdoor sprays, furniture sprays, and a monthly treatment on her pets' necks. Tr. 65. She testified that "the fleas were not as bad as [Weber] said" they were after his last visit, reporting that she only "got some" fleas on her. Tr. 74.

{¶39} The record also indicates Temple moved back into the West Warren House even though this residence had not been approved by CCJFS. Judgment Entry Semiannual Administrative Review Summary June 18, 2019. In their final semiannual report, CCJFS noted that Temple was not complying with the DOH order to vacate the West Warren House by living on those premises. *Id*. CCJFS also reported that there were piles of animal feces at Temple's West Warren House during each of their visits. *Id*. CCJFS stated that, in this regard, Temple had failed to maintain her home free of safety hazards. *Id*.

{¶40} At the hearing, Temple testified that the DOH order only prohibited pregnant women and children under age nine from living in those premises. Tr. 72. On cross-examination, however, Temple was given and asked to read a copy of the DOH's order to vacate. Tr. 79. The DOH order stated that the West Warren House had been declared unsafe for human occupants. Tr. 79. Temple testified that this order had been posted on the front door of the West Warren House but alleged that she talked to someone at the DOH who said that she could live there. Tr. 78.

{¶41} Temple's testimony indicated that she had a property maintenance violation for the outside condition of the West Warren House. Tr. 73, 80. There were issues with the gutters, windows, siding, and outside stairs to the basement. Tr. 80. By the time of the permanent custody hearing, the property maintenance violation for the West Warren House had not yet been resolved. Tr. 81. Temple said that she had one month left to bring her home into compliance and that she was close to resolving these issues. Tr. 81.

{¶42} In the end, the case plan "asked that [Temple] be able to maintain safe and stable housing for a period of at least three months; to remove the lead; to keep the house free of trash, feces, fleas, bed bugs, roaches." Tr. 14. Weber testified that Temple was not able to accomplish this goal of the case plan by the expiration of CCJFS's two-year timeframe for cases. Tr. 14, 15. At the time of the hearing on the motion for permanent custody, the children had been in the custody of CCJFS

for roughly twenty-seven months.[3]  Tr. 15.  Weber stated that, at this point, Temple could not complete the goal of maintaining stable housing for three months because the case was already beyond the two-year timeframe.  Tr. 15.

{¶43} After considering this testimony, the trial court stated the following in its judgment entry:

> **the testimony was that the agency provided bug bomb removal products as requested by the mother.  As of the date of the hearing, the mother acknowledged the home still has "bugs" but there was no testimony she requested more pest eradication products and was denied by the agency. * * * As to the clean and sanitary home conditions free of hazards, this is a matter of simple, routine housekeeping standards that a custodial parent should assume responsibility for.  Regular cleaning, food storage, proper waste disposal and removal, laundry, and storage of unused items are daily tasks that must be performed by everyone. Although it wasn't argued, certainly counsel for mother is not suggesting reasonable efforts would have been for the agency to arrange and pay for a housekeeping service for this mother.**

Judgment Entry October 8, 2019.

{¶44} The trial court then concluded that the children "should not be placed with either parent because the parents have continuously failed to substantially remedy the conditions causing the children to be placed outside of the home * * *." Judgment Entry October 8, 2019.  *See* R.C. 2151.414(B)(1)(a); R.C.

---

[3] Under R.C. 2151.414(B)(1)(d), a trial court may grant a motion for permanent custody to the agency that filed the motion for permanent custody if, by clear and convincing evidence, it is in the best interest of a child and if the child has been in the temporary custody of a public children's services agency for at least twelve months of the preceding twenty-two month period.  R.C. 2151.141(B)(1)(d).  Thus, in this case, permanent custody could have been granted pursuant R.C. 2151.414(B)(1)(d) as the children had been in the temporary custody of CCJFS for more than twelve months of the preceding twenty-two month period.  Tr. 15. Judgment Entry October 8, 2019.  However, R.C. 2151.414(B)(1)(d) was never raised by the permanent custody movant herein.  Motion for Permanent Custody April 19, 2019.

2151.414(E)(1). The trial court also found that "this situation is not likely to improve in the foreseeable future * * *." Judgment Entry October 8, 2019. A review of the record indicates that there was clear and convincing evidence from which the trial court could find that the children could not be placed with Temple in a reasonable time "notwithstanding reasonable case planning and diligent efforts by the agency" because Temple has failed "continuously and repeatedly to substantially remedy the conditions" that caused the children to be removed from her home. R.C. 2151.414(E)(1). *See* R.C. 2151.414(B)(1)(a).

{¶45} In its judgment entry, the trial court also found that R.C. 2151.414(E)(4) applied to the facts of this case. Judgment Entry October 8, 2019. Under R.C. 2151.414(E)(4) the trial court is to consider whether "[t]he parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child * * *." R.C. 2151.414(E)(4). In her second assignment of error, Temple briefly challenges this finding, arguing that she did not display a lack of commitment to the children "by failing to regularly support, visit, or communicate with the child[ren] when able to do so." R.C. 2151.414(E)(4). *See* Appellant's Brief, 16-17.

{¶46} The trial court found that Temple's visitation was "problematic" because recurring insect infestations interfered with the children's ability to visit Temple at her home. Judgment Entry October 8, 2019. Further, Temple also

admitted that she had not paid child support prior to working at UDF. Tr. 72. She stated that she had believed that child support was being withdrawn from her paychecks and that she did not know that she was not paying child support. Tr. 78, 83. A record of her child support history was introduced into evidence and indicated that she had not paid child support regularly. Ex. 1. On the basis of this evidence, the trial court found that Temple's "contribution to the support of the children despite the record of gainful employment has been sporadic * * *." Judgment Entry October 8, 2019.

{¶47} The trial court also found that Temple's "acceptance of, and allowance of, chronic uncleanliness, clutter and vermin infestation goes beyond being worrisome * * *." Judgment Entry October 8, 2019. Considering this history, the trial court also found that "the parents do not appear to be motivated or committed to making the necessary sustained changes to get these children back into a stable, nurturing home * * *." *Id.* A review of the record reveals that there is clear and convincing evidence from which the trial court could find that Temple "demonstrated a lack of commitment toward the child[ren] * * * or * * * an unwillingness to provide an adequate permanent home for the child[ren]."

{¶48} We note that, even if the trial court's finding under R.C. 2151.414(E)(4) was not supported by clear and convincing evidence, it would not change the outcome of this case because we have already determined, by clear and convincing evidence, that R.C. 2151.141(E)(1) is herein applicable. In order for

-23-

R.C. 2151.414(B)(1)(a) to be grounds for granting a motion for permanent custody, only one of the factors listed in R.C. 2151.414(E) needs to be applicable and supported by clear and convincing evidence. *See In re A.F., supra*, at ¶ 54 (holding that "if one or more of the factors enumerated in R.C. 2151.414(E) is found to be present by clear and convincing evidence, the trial court shall find that the child cannot be placed with the parents within a reasonable period of time or should not be placed with the parents.").

{¶49} After reviewing the evidence in the record, we cannot conclude that the findings that Temple challenges on appeal are against the manifest weight of the evidence. *See In re J.D.*, 3d Dist. Hancock No. 5-10-34, 2011-Ohio-1458, ¶ 30; *In re C.B.*, 3d Dist. Seneca Nos. 13-12-06, 13-12-07, 2012-Ohio-2691, ¶ 60. There is clear and convincing evidence on which the trial court based its findings. Thus, the trial court did not err in granting the motion for permanent custody. Temple's first and second assignments of error are overruled.

*Conclusion*

{¶50} Having found no error prejudicial to the appellant in the particulars assigned and argued, the judgments of the Juvenile Division of the Crawford County Court of Common Pleas are affirmed.

***Judgments Affirmed***

**PRESTON and ZIMMERMAN, J.J., concur.**

**/hls**