[Cite as *In re B.G.*, 2021-Ohio-4250.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HANCOCK COUNTY

IN RE:

    B.G., JR.,

ALLEGED DEPENDENT CHILD

[R.H. - APPELLANT]

CASE NO. 5-21-13

O P I N I O N

IN RE:

    B.G., JR.,

ALLEGED DEPENDENT CHILD

[B.G., SR. - APPELLANT]

CASE NO. 5-21-17

O P I N I O N

Appeal from Hancock County Common Pleas Court
Juvenile Division
Trial Court No. 20203003

Judgments Affirmed

Date of Decision:  December 6, 2021

APPEARANCES:

    *Angela M. Elliot* for Appellant, R.H.

    *Linda Gabriele* for Appellant, B.G., Sr.

    *Justin Kahle* for Appellee

**WILLAMOWSKI, P.J.**

{¶1} Mother-Appellant R.H. ("R.H.") and Father-Appellant B.G. ("B.G.Sr.") appeal the judgment of the Juvenile Division of the Hancock County Court of Common Pleas, alleging that the trial court erred (1) in deciding to grant permanent custody to the Child Protective Services Unit of Hancock County Job and Family Services ("CPSU"); and (2) in finding that the CPSU made reasonable efforts to accommodate the appellants' intellectual disabilities by diligent case planning. For the reasons set forth below, the judgments of the trial court are affirmed.

*Facts and Procedural History*

{¶2} B.G. ("B.G.Jr.") is the child of B.G.Sr. and R.H. Doc. 1. B.G.Jr. was born prematurely in December of 2019. Doc. 1. At that time, B.G.Sr. had a "violent outburst * * * toward medical staff and security * * * had to remove him from the unit where [B.G.Jr.] * * * is located." Doc. 1. Further, R.H. and B.G.Sr. were "unable to care for B.G.Jr. or demonstrate that they [were] * * * able to understand how to care for [B.G.Jr.] * * * and follow through with his care." Doc. 1. Tr. 43-44. R.H. and B.G.Sr. were also, at that time, without a home. Doc. 1. Tr. 43.

{¶3} The CPSU requested an ex parte order from the trial court, alleging that R.H. and B.G.Sr. were "developmentally delayed"; currently homeless; and unable to give proper care to B.G.Jr. Doc. 1. On January 13, 2020, the trial court granted the requested ex parte order. Doc. 1. On January 13, 2020, the CPSU filed a

complaint that alleged B.G.Jr. was a dependent child. Doc. 2. On January 14, 2020, the trial court issued an order that determined that B.G.Jr. "be placed in the Emergency Temporary Custody of [the] CPSU." (Emphasis removed.) Doc. 8.

{¶4} On February 27, 2020, the trial court found that B.G.Jr. was a dependent child. Doc. 23. On March 12, 2020, the trial court held a dispositional hearing and determined that the CPSU should retain temporary custody of B.G.Jr. Doc. 26. On December 21, 2020, the CPSU filed a motion for permanent custody. Doc. 32. On April 12, 2021, the trial court held a hearing on this motion. Tr. 1. On April 26, 2021, the trial court granted the CPSU's motion for permanent custody. Doc. 59.

{¶5} R.H. filed her notice of appeal on April 27, 2021.[1] Doc. 63. On appeal, she raises the following two assignments of error:

**R.H.'s First Assignment of Error**

**The trial court's decision to grant permanent custody to the agency is against the manifest weight of the evidence as the appellee did not prove by clear and convincing evidence that the minor child should not be reunited with the mother.**

**R.H.'s Second Assignment of Error**

**The trial court committed prejudicial error in finding that the Hancock County Children Services Board made reasonable efforts and diligent case planning to accommodate mother's intellectual disabilities.**

---

[1] This case was erroneously processed as two separate appeals. For this reason, there are two judgment entries and two case numbers, even though these appeals are based on one child, one judgment entry, and one record.

On May 3, 2021, B.G.Sr. filed his notice of appeal. Doc. 71. On appeal, he raises the following two assignments of error:

### B.G.Sr.'s First Assignment of Error

**The trial court's decision to grant permanent custody to the agency is against the manifest weight of the evidence as the appellee did not prove by clear and convincing evidence that the minor child should not be reunited with his father.**

### B.G.Sr.'s Second Assignment of Error

**The trial court committed prejudicial error in finding that the Hancock County Children Services Board made reasonable efforts and diligent case planning to accommodate father's intellectual disabilities.**

Because R.H. and B.G.Sr.'s first assignments of error contain virtually the same arguments, we will address them in one analysis. For the same reason, we will address R.H. and B.G.Sr.'s second assignments of error together.

*R.H. and B.G.Sr.'s First Assignments of Error*

{¶6} R.H. and B.G.Sr. argue that the trial court's decision to grant permanent custody to the CPSU was against the manifest weight of the evidence.

Legal Standard

{¶7} "The right to raise one's child is a basic and essential right." *In re C.C.*, 3d Dist. Marion No. 9-20-06, 2020-Ohio-5138, ¶ 14. However, this "right[] may be terminated under appropriate circumstances and when the trial court has met all due process requirements." *Id*. "When considering a motion for permanent custody of

a child, the trial court must comply with the statutory requirements set forth in R.C. 2151.414." *In re A.M.*, 3d Dist. Marion No. 9-14-46, 2015-Ohio-2740, ¶ 13.

{¶8} "R.C. 2151.414(B)(1) establishes a two-part test for courts to apply when determining whether to grant a motion for permanent custody: (1) the trial court must find that one of the circumstances in R.C. 2151.414(B)(1)(a)-(e) applies, and (2) the trial court must find that permanent custody is in the best interest of the child." *In re Y.W.*, 3d Dist. Allen No. 1-16-60, 2017-Ohio-4218, ¶ 10. R.C. 2151.414(B)(1) reads, in its relevant part, as follows:

> **(B)(1) * * * [T]he court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:**
>
> **(a) * * * [T]he child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.**

R.C. 2151.414(B)(1)(a). To determine if a child can or cannot be placed with either of the child's parents within a reasonable time, the trial court must evaluate the case under the factors set forth in R.C. 2151.414(E). *In re A.F.*, 3d Dist. Marion No. 9-11-27, 2012-Ohio-1137, ¶ 54.

> **If one or more of the factors enumerated in R.C. 2151.414(E) is found to be present by clear and convincing evidence, the trial court shall find that the child cannot be placed with the parents within a reasonable period of time or should not be placed with the parents.**

*Id*. R.C. 2151.414(E) includes the following factors that are relevant to this case:

**(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.**

**(2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;**

**\* \* \***

**(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;**

R.C. 2151.414(E). "'If the trial court determines that any provision enumerated in R.C. 2151.414(B)(1) applies,' it must proceed to the second prong of the test \* \* \*."

*In re K.M.S.*, 3d Dist. Marion Nos. 9-15-37, 9-15-38, and 9-15-39, 2017-Ohio-142, ¶ 23, quoting *In re A.F.*, *supra*, at ¶ 55.

{¶9} To determine whether a grant of permanent custody is in the child's best interests, the trial court must consider the factors in R.C. 2151.414(D)(1), which includes the following factors that are relevant to this case:

**(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;**

**(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;**

**(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;**

**(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;**

**\* \* \***

R.C. 2151.414(D)(1). "R.C. 2151.414(D)(1) does not require a juvenile court to expressly discuss each of the best-interest factors in R.C. 2151.414(D)(1)(a) through (e). Consideration is all the statute requires." *In re A.M.*, --- Ohio St.3d ---, 2020-Ohio-5102, --- N.E.3d ---, ¶ 31.

**{¶10}** "If the trial court makes the statutorily required determinations, a reviewing court will not reverse a trial court's decision unless it is not supported by clear and convincing evidence." *In re E.B.*, 3d Dist. Hancock Nos. 5-21-09 and 5-21-10, 2021-Ohio-3641, ¶ 17.

> **Clear and convincing evidence is more than a preponderance of the evidence but not as much evidence as required to establish guilt beyond a reasonable doubt as in a criminal case; rather, it is evidence which provides the trier of fact with a firm belief or conviction as to the facts sought to be established.**

*In re A.T.*, 3d Dist. Crawford Nos. 3-19-13, 3-19-14, and 3-19-15, 2020-Ohio-2781, ¶ 23, quoting *In re H.M.K.*, 3d Dist. Wyandot Nos. 16-12-15 and 16-12-16, 2013-Ohio-4317, ¶ 42. Further,

> **When an appellate court reviews whether a trial court's permanent custody decision is against the manifest weight of the evidence, the court 'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'**

*In re Dn.R.*, 3d Dist. Shelby No. 17-20-06, 2020-Ohio-6794, ¶ 16, quoting *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20, quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115, 750 N.E.2d 176 (9th Dist. 2001).

## Legal Analysis

**{¶11}** The trial court found that three of the factors listed in R.C. 2151.414(E) were applicable in this case. Doc. 59. First, the trial court found that

"the parent[s] ha[ve] failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home." Doc. 59, quoting R.C. 2151.414(E)(1).

> **[R.H.] and [B.G.Sr.] * * * had four objectives on their case plan in addition to visitation. Those four objectives included 1) maintaining a safe and stable home; 2) completing parent education; 3) completing gain assessments and 4) cooperating [with] the Developmental [D]isabilities and SSA service providers.**

Doc. 59. The trial court found that the parents had found a home that was "physically safe." Doc. 59. Tyler Layton ("Layton"), a caseworker for Hancock Job and Family Services, testified that, although R.H. and B.G.Sr. had lived in four different residences since the CPSU had been involved with B.G.Jr., the house where they were currently living was safe. Tr. 52, 56.

{¶12} However, Layton testified that R.H. and B.G.Sr. lived with a person, Stormy Heath ("Heath"), who concerned the CPSU because of her prior involvement in an unrelated children's services case. Tr. 52. Further, Karmen Lauth ("Lauth"), a supervisor at Hancock County Job and Family Services, explained that, in this prior case, there were issues with "domestic violence between Ms. Heath and her former boyfriend." Tr. 121. However, Lauth also stated that Heath was no longer with this particular boyfriend. Tr. 122.

{¶13} As to parenting education, Layton testified that R.H. and B.G.Sr. had not completed the "parent education and home coaching regarding infants and

toddlers neglect issues and discipline." Tr. 57-58. He also stated that the parents had not completed the GAIN assessment to address any mental health or substance abuse issues that she might have. Tr. 58. Layton then testified that R.H. and B.G.Sr. had refused to cooperate with the Board of Developmental Disabilities or the Social Security Administration. Tr. 58-59. He stated that the parents "have both been outspoken in the fact that they do not need DD services, or SSA, for that matter. They * * * have completely disregarded that, those services." Tr. 59.

{¶14} Second, the trial court found that "[b]oth parents suffer from an intellectual disability." Doc. 59. *See* R.C. 2151.414(E)(2). At the hearing, Morgan Lehman ("Lehman"), a caseworker at the Harmony House supervised visitation facility, testified that the parents struggled to change B.G.Jr.'s diapers during their visits and did not know how to hold a baby. Tr. 21, 36, 39. Further, Layton testified that R.H. did not know how to respond to B.G.Jr.'s cries; was inconsistent in visiting; and was not bonded with the baby. Tr. 63, 65. Similarly, he testified that B.G.Sr. had not bonded with the child; that B.G.Jr. would not stop crying with him; and that he inconsistent in visitation. Tr. 65-66. However, neither parent, according to Layton's testimony, took advantage of the parenting education services that had been offered to them. Tr. 57-58.

{¶15} The trial court also noted that Lehman's testimony indicated that R.H. and B.G.Sr. were not able "to adequately parent during the infrequent visitations that the parents attended." Doc. 59. While the extent of their inability to care for

-10-

B.G.Jr. was unclear because they "refus[ed] to cooperate with services," the trial court found that the parents "remained steadfast in their position that they do not need any help" and that "[i]t does not appear that the parents * * * will accept help anytime soon." Doc. 59. For these reasons, the trial court found that R.H. and B.G.Sr. were "unable to provide an adequate permanent home for the child" because they each have an "intellectual disability." Doc. 59.

{¶16} Third, the trial court found that R.H. and B.G.Sr. have "demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so * * *." Doc. 59, quoting R.C. 2151.414(E)(4). Lehman testified that R.H. and B.G.Sr. did not consistently come to visitation with B.G.Jr. and had three suspensions of visitation because of her failure to attend visitation. Tr. 25. Layton also testified that R.H. and B.G.Sr. were not consistent in their visitation, coming to only 54% of the visits. Tr. 85. He stated that they had issues securing transportation but would not notify the CPSU of their need for transportation until "the day of" their visitation appointment. Tr. 69. The CPSU had informed them of various transportation services that could assist them. Tr. 68. Based on these findings, the trial court concluded that B.G.Jr. could not "be placed with his parents within a reasonable time and should not be placed with them." Doc. 59.

{¶17} The trial court then considered whether the award of permanent custody to the CPSU was in the child's best interests under the five factors listed in

-11-

R.C. 2151.414(D)(1). Doc. 59. First, regarding B.G.Jr.'s interactions with his parents, Lehman testified that B.G.Jr. cried throughout the supervised visits with his parents and had to be removed repeatedly to address this. Tr. 19, 38. Layton also testified that, when B.G.Jr. cries throughout their visitation, his parents do not understand how to respond to or help him. Tr. 63.

{¶18} Further, Lehman testified that B.G.Sr. and R.H. struggle to change B.G.Jr.'s clothes and diapers. Tr. 37-38. On one occasion, B.G.Jr.'s head hit the floor three times while R.H. was trying to change his diaper. Tr. 37. Based on this testimony, the trial court concluded that

> **[t]he parents have struggled to parent the child during the visitations. [B.G.Jr.] * * * often cries throughout his visits with his parents. Furthermore, the parents have been unable to keep [B.G.Jr.] * * * safe during visitations and allowed his head to hit the floor. The child is bonded with his foster parents and they often remain at the visitation center and calm [B.G.Jr.] * * * when he cannot be calmed during the visit with his parents.**

Doc. 59, citing R.C. 2151.414(D)(1)(a).

{¶19} Second, as to the wishes of the child, the trial court stated that B.G.Jr. could not express his preferences as a one year old but did note that his guardian ad litem had recommended that permanent custody be granted to the CPSU. Doc. 59, citing R.C. 2151.414(D)(1)(b). *See* Doc. 56. Third, as to the child's custodial history, B.G.Jr. had been in the temporary custody of the CPSU since January of 2020. Doc. 1, 8. The trial court found that "[t]he parents have not progressed past supervised visitations" and again noted that they "struggle to care for [B.G.Jr.'s] *

* * needs during the supervised visitations." Doc. 59, citing R.C. 2151.414(D)(1)(c).

{¶20} Fourth, as to whether B.G.Jr. could obtain a secure placement without granting the CPSU permanent custody, Layton affirmed that B.G.Jr. needed "a legally-secure placement" and that this could not happen unless the CPSU received permanent custody. Tr. 70. Leah Cole ("Cole"), B.G.Jr.'s guardian ad litem, stated in her report that, "[e]xcept for a relatively short period (about two months), [B.G.Sr. and R.H.] * * * had lived under the supervision and care of others." Doc. 56. Cole testified that

> **during their brief time of living on their own, they refused to work with their SSA providers and their waiver providers, which is part of what began this process and put their residence in jeopardy.**

Tr. 127. She also testified that B.G.Sr. and R.H. have "told [her] * * * that they don't believe they need services from SSAs" and that they "have not complied with case plan services." Tr. 133. Layton similarly testified that B.G.Sr. and R.H. have not progressed in their case plan. Tr. 49, 61, 66, 91. The trial court then concluded that R.H. and B.G.Sr.

> **failed to make the necessary changes in their life and appear steadfast in their refusal to accept help. Their current level of parenting results in visits that cause the child to cry uncontrollably and put his safety at risk.**

Doc. 59, citing R.C. 2151.414(D)(1)(d). *See also In re R.L.*, 9th Dist. Summit Nos. 27214 and 27233, 2014-Ohio-3117, ¶ 34 (stating that "although case plan

-13-

compliance may be relevant to a trial court's best interest determination, it is not dispositive of it").

{¶21} Further, Layton testified that the CPSU examined various kinship placement options. Tr. 72. The CPSU looked into whether the child could be placed with B.G.Sr.'s parents but found that B.G.Sr. has a "very volatile relationship" with them that was "broken, beyond repair." Tr. 72. Two other family members "opted out as an option" because of their advanced aged. Tr. 73. The final kinship placement option had a prior history with children's services and, for that reason, was not approved for a home study. Tr. 74.

{¶22} Lauth testified that R.H. and B.G.Sr. wanted Heath to receive custody of B.G.Jr. Tr. 114. *See* Tr. 143. However, Heath had no prior relationship or connection with B.G.Jr. Tr. 114. Further, because of her history with children's services, Heath was not considered for a home study. Tr. 116-117. Further, Layton testified that B.G.Jr. was bonded to his current foster parents. Tr. 76. The trial court found that the factors in R.C. 2151.414(D)(1)(a), (c), and (d) indicated that a grant of permanent custody to the CPSU was in B.G.Jr.'s best interests. Doc. 59.

{¶23} However, R.H. and B.G.Sr. argue that the trial court cannot grant permanent custody to the CPSU based on their "intellectual disabilities" alone. R.H.'s Brief, 6. B.G.Sr.'s Brief, 12. They direct our attention to *In re D.A.* wherein the Ohio Supreme Court held that, "[w]hen determining the best interest of a child under R.C. 2151.414(D) at a permanent-custody hearing, a trial court may not base

its decision solely on the limited cognitive abilities of the parents." *In re D.A.*, 113 Ohio St.3d 88, 2007-Ohio-1105, 862 N.E.2d 829, at syllabus.

**{¶24}** The case presently before this Court is distinguishable from *In re D.A.* At the outset, we note that, "[i]n *In re D.A.*, * * * the parents complied with every aspect of their case plan except one, which the agency suspended * * *." *In re M.S.*, 2d Dist. Clark No. 2008 CA 70, 2009-Ohio-3123, ¶ 43, citing *In re D.A.*, ¶ 36. Turning to the case before us, the record indicates that R.H. and B.G.Sr. "did not comply with their case plan and progress enough in the case plan." Tr. 49, 61, 66, 91, 133. *See* Doc. 56, 59. *In re Cunningham Children*, 3d Dist. Seneca Nos. 13-08-27, 13-08-28, 13-08-29, and 13-08-30, 2008-Ohio-5938, ¶ 13; *In re Kinkel*, 5th Dist. Stark No. 2006CA00358, 2007-Ohio-2322, ¶ 29. Thus, they failed to take the steps that were necessary to remedy the issues that led to B.G.Jr. being removed from their custody.

**{¶25}** We also note that the record does not indicate that the trial court made its decision to grant permanent custody solely on the basis of R.H. and B.G.Sr.'s intellectual disabilities. *See In re D.A.* at ¶ 37. The trial court found that three factors in R.C. 2151.414(D)(1) supported the conclusion that a grant of permanent custody to the CPSU was in the child's best interests. Doc. 59. *In re M.N.*, 4th Dist. Athens No. 08CA9, 2008-Ohio-4821, ¶ 23 (finding that, unlike in *In re D.A.*, "the trial court appropriately considered all of the best interest factors"). In particular, the trial court emphasized the unwillingness of the parents to engage with the

services that would have given them the skills and assistance that they needed to provide B.G.Jr. with a stable home. Doc. 59, citing R.C. 2151.414(D)(1)(d).

{¶26} Further, the trial court found that R.H. and B.G.Sr. had failed to progress beyond supervised visits; struggled to care for B.G.Jr. during their visitation; and "put [B.G.Jr.'s] * * * safety at risk." Doc. 59. In her Guardian ad Litem report, Cole's list of concerns included that R.H. and B.G.Sr. were "explosive and volatile"; had "impaired decision-making"; and have "difficulty maintaining hygiene." Doc. 56. Cole's report also stated the following:

> **When given an opportunity to be independent, [B.G.Sr.] * * * and [R.H.] * * * lived in a substandard environment that include filth, rotting food, urine and feces, and bugs. They did not ask for or accept assistance when circumstances were at their worst. They refused service providers from the Lucas County Board of D[evelopmental] D[isabilities]. They were in the process of being evicted when a family member intervened.**

Doc. 56. *See* Tr. 127. *See* Doc. 22. Thus, in this case, "objective evidence existed to show that the statute was satisfied." *In re N.M.*, 2d Dist. Montgomery Nos. 26693 and 26719, 2016-Ohio-318, ¶ 30, quoting *In re D.A., supra*, at ¶ 37.

{¶27} Having examined the evidence in the record, we conclude that R.H. and B.G.Sr. have not demonstrated that the trial court's decision to grant the CPSU permanent custody of B.G.Jr. was against the manifest weight of the evidence. There is competent, credible evidence in the record that supports the findings of the trial court. Thus, R.H.'s first assignment of error is overruled, and B.G.Sr.'s first assignment of error is overruled.

*R.H. and B.G.Sr.'s Second Assignments of Error*

{¶28} R.H. and B.G.Sr. argue that the trial court erred in concluding that the CPSU engaged in reasonable case planning and diligent efforts to reunite the family.

Legal Standard

{¶29} In the process of determining whether a child should be removed from his or her home, the trial court

> **[s]hall determine whether the public children services agency \* \* \* that filed the complaint in the case, removed the child from home, has custody of the child, or will be given custody of the child has made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home. The agency shall have the burden of proving that it has made those reasonable efforts.**

R.C. 2151.419(A)(1). In interpreting this provision, the Ohio Supreme Court held:

> **R.C. 2151.419(A)(1) does not apply in a hearing on a motion for permanent custody filed pursuant to R.C. 2151.413. However, except for some narrowly defined statutory exceptions, the state must still make reasonable efforts to reunify the family during the child-custody proceedings prior to the termination of parental rights. If the agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time.**

*In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 43.

> **Case plans are the tool that child protective service agencies use to facilitate the reunification of families who, for whatever reason, be it abuse, neglect or otherwise, have been temporarily separated. Case plans establish individual goals, concerns and the steps that the parent and agency will take in order to achieve reunification.**

*In re Evans*, 3d Dist. Allen No. 1-01-75, 2001 WL 1333979, *3 (Oct. 30, 2001).

> **'Agencies have an affirmative duty to diligently pursue efforts to achieve the goals in the case plan.' [*In re T.S.*, 3d Dist. Mercer Nos. 10-14-13, 10-14-14, and 10-14-15, 2015-Ohio-1184, ¶ 27], citing In re Evans at *3. 'Nevertheless, the issue is not whether there was anything more that [the agency] could have done, but whether the [agency's] case planning and efforts were reasonable and diligent under the circumstances of this case.' [*In re T.S.*], quoting *In re Leveck*, [3d Dist. Hancock Nos. 5-02-52, 5-02-53., and 5-02-54,] 2003-Ohio-1269, ¶ 10]. "'Reasonable efforts' does not mean all available efforts. Otherwise, there would always be an argument that one more additional service, no matter how remote, may have made reunification possible." *In re H.M.K.*, [3d Dist. Wyandot Nos. 16-12-15 and 16-12-16,] 2013-Ohio-4317, ¶ 95, quoting *In re M.A.P.*, 12th Dist. Butler Nos. CA2012-08-164 and CA2012-08-165, 2013-Ohio-655, ¶ 47. 'We also note that the statute provides that in determining whether reasonable efforts were made, the child's health and safety is paramount.' *In re T.S.* at ¶ 27, citing R.C. 2151.419(A)(1).**

*In re A.M.*, 3d Dist. Marion No. 9-14-46, 2015-Ohio-2740, ¶ 25.

{¶30} "We review under an abuse-of-discretion standard a trial court's finding that an agency made reasonable efforts toward reunification." *In re A.M.* at ¶ 24. An abuse of discretion is not merely an error in judgment. *Southern v. Scheu*, 3d Dist. Shelby No. 17-17-16, 2018-Ohio-1440, ¶ 10. Rather, to constitute an abuse of discretion, the trial court's decision must be unreasonable, arbitrary, or capricious. *Schroeder v. Niese*, 2016-Ohio-8397, 78 N.E.3d 339, ¶ 7 (3d Dist.).

Legal Analysis

{¶31} R.H. and B.G.Sr. argue that the CPSU did not accommodate their "apparent cognitive restrictions" by fully explaining the objectives in the case plan.

R.H.'s Brief, 8.  However, at the hearing, Layton testified that he discussed the details of the case plan with the parents, saying "oftentimes, we would speak about like kind of priority, although I knew they needed to get all of it done, we would speak about what is the most important, * * * how to tackle the situation."  Tr. 101.  He affirmed that he "didn't just hand them the case plan" but went over the case plan with them multiple times.  Tr. 101-102.

**{¶32}** Further, Layton stated that he knew R.H. understood the case plan because, after the CPSU filed its motion for permanent custody, she called him on more than one occasion and

> **actually went through all of her objectives on the phone * * *, angrily, explaining that she has done * * * objective one through whatever it may be.**

> **She was wrong in that, but she explained to me each objective, and that she's safe and stable housed now, she is going to be taking parenting classes, they're taking some counseling, and they're doing their medicine, and they don't need DD services.**

Tr. 103.  Layton testified that he explained to both R.H. and B.G.Sr. what was expected of them.  Tr. 103.  Cole also testified that R.H. and B.G.Sr. "have relayed to me very well what their case plan requires" and affirmed that they "understand what is being expected of them * * *."  Tr. 135.  She concluded by saying that her "concern was that the services that they needed most, they were refusing * * *" and that they demonstrated "a lack of interest * * *."  Tr. 139, 127.

{¶33} Layton testified that the content of the case plan was fairly standard. Tr. 89, 97. After he was questioned about why two parents with developmental disabilities received a fairly standard case plan, he stated the following:

**The case plan was cultivated for the family based on what they were struggling with. I understand the cookie-cutter argument, but the reality of the situation is they were struggling with parenting techniques, skills, they were struggling with having safe and stable housing, and ultimately, they were struggling with med management and working with DD services. None of those things have been done completely.**

Tr. 97. *See* Tr. 89-90. Layton testified that the CPSU made referrals for all of the services that R.H. and B.G.Sr. needed. Tr. 67.

{¶34} However, Cole testified that she had experience working with people who had developmental disabilities, having been employed "in the MRDD field for seven, eight years * * *." Tr. 125-126, 135. She then testified that she was involved in the formation of the case plan after the CPSU sought her input and had signed the case plan in February of 2020. Tr. 136, 138. Further, the record indicates that many of the case plan objectives that R.H. and B.G.Sr. refused to complete were generally those that were geared towards helping them to manage their developmental disabilities. Doc. 17. Tr. 58, 70, 139.

{¶35} Having reviewed the materials in the record, we conclude that R.H. and B.G.Sr. have not demonstrated that the trial court erred in finding that the CPSU engaged in reasonable case planning and diligent efforts to reunite the family. The evidence in the record does not contain any indication that the trial court abused its

discretion in reaching this conclusion. Doc. 56. As such, R.H.'s second assignment of error is overruled, and B.G.Sr.'s second assignment of error is also overruled.

### *Conclusion*

{¶36} Having found no error prejudicial to the appellants in the particulars assigned and argued, the judgments of the Juvenile Division of the Hancock County Court of Common Pleas are affirmed.

*Judgments Affirmed*

**ZIMMERMAN and SHAW, J.J., concur.**

**/hls**