[Cite as *In re N.A.*, 2024-Ohio-2961.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HENRY COUNTY

IN RE:                                             CASE NO. 7-23-16

    N.A.

[HENRY COUNTY JOB AND                    **O P I N I O N**
FAMILY SERVICES - APPELLANT]

**Appeal from Henry County Common Pleas Court
Juvenile Division
Trial Court No. 20213005**

**Judgment Reversed and Cause Remanded**

**Date of Decision:  August 5, 2024**

**APPEARANCES:**

    *Melody Wilhelm* **for Appellant**

    *Judith A. Myers* **for Appellee**

    *Laurel A. Kendall*, **Guardian Ad Litem**

**WALDICK, J.**

{¶1} Plaintiff-appellant, Henry County Department of Job and Family Services ("JFS"), brings this appeal from the September 22, 2023, judgment of the Henry County Common Pleas Court, Juvenile Division, dismissing JFS's motion for permanent custody. For the reasons that follow, we reverse.

*Background*

{¶2} N.A. was born in November of 2007. His mother is Regina R. and his father is Samuel S. N.A. has a younger half-brother, K. Both children share the same mother, but not the same father. N.A.'s father was not involved in this case.

{¶3} N.A. has numerous mental health diagnoses: he is autistic, he is developmentally disabled, he has ODD, and he has ADHD.[1] Moreover, while N.A. was living with Regina, K., Regina's parents, and Regina's brother, N.A. and K. were sexually abused by Regina's brother. The incident ultimately led to charges against Regina's brother, and Regina's brother was convicted of Gross Sexual Imposition against N.A. and K.

{¶4} On March 24, 2021, JFS filed a complaint that alleged N.A. was a neglected child. It was alleged that Regina was allowing both boys to be exposed to her brother/the children's' abuser. This was a violation of Ramiro's "parole" and resulted in his incarceration for the violation.

---

[1] N.A.'s brother, K., does not have the same mental health issues.

{¶5} In addition, with regard to N.A., it was alleged that N.A. had attendance issues at school, and that when he was at school he wore the same dirty clothes every day. Further, it was alleged that N.A. was displaying overly sexualized behaviors such as exposing himself to students and staff at school. N.A. had also apparently made a threat on the school bus to take a gun to school and shoot the teachers.

{¶6} The complaint was subsequently amended, alleging that N.A. was a dependent child as defined in R.C. 2151.04(A). Regina ultimately admitted that N.A. was a dependent child and JFS was granted temporary custody of N.A.

{¶7} When N.A. was originally removed from Regina's care, N.A. was unable to wipe himself after going to the bathroom and he was unable to shower independently despite being 13 years old. He would also soil himself, and he would smear feces on the walls. He needed assistance brushing his teeth. He engaged in self-harm. He "barely could communicate different things that [were] going on[.]" (Tr. at 154). He had significant dental issues. After being placed in a group home, N.A. made tremendous progress such that most of these things were no longer issues. He also was able to clean his own room and do his own laundry.

{¶8} As the case progressed, the record reflects that Regina was inconsistent in engaging with the case plan. She secured independent housing but her employment was unstable. One witness testified that Regina had "over 30 jobs since the duration [sic] of this case." (Tr. at 651). The record reflects that Regina failed to

complete parenting classes, she failed to regularly engage in mental health counselling, and she failed to engage in family coaching.

{¶9} Notably, Regina did undergo a psychological evaluation. The evaluation showed that Regina had a "Borderline" full scale IQ of 70, placing her in the 2nd percentile. She scored "extremely low" in verbal comprehension, perceptual reasoning, and general ability. Based on the evaluation, the clinical psychologist recommended that Regina "should not have primary caretaking responsibilities for her son, [N.A.]." The psychologist did not have the same opinion with regard to Regina's son K., because K. did not have the same special needs.

{¶10} During the pendency of this case, Regina engaged in supervised visitation with N.A., which eventually progressed to partly supervised and partly unsupervised but in public. During one of the supervised visits, Regina and N.A. went to a restaurant. While in line for food, N.A. kissed Regina on the lips for 5-6 seconds. The supervisor testified: "I believe it was open mouth, but it was definitely, his hands were clasped around her neck, he pulled her in and kissed her on the mouth." (Tr. at 449). Regina did not redirect the behavior, so the supervisor did. Later during the meal, N.A. showed significant regression in his behavior.

{¶11} Around this time, N.A. also made several disclosures to his therapist claiming that he had been sexually abused by Regina and by Regina's parents.[2] He

---

[2] During a "play therapy" session N.A. had with his therapist, N.A. had a toy figure representing himself and one representing his mother "and he actually used the toys to hump up and down with his mom."

also claimed that he had engaged in sexual conduct with his brother, K. Further, N.A. claimed that he had observed Regina engaging in sexual conduct, and that he had frequently watched pornography while he was in Regina's home.[3] The record reflects that the sexual assault allegations against Regina were investigated and found to be "unsubstantiated." The other allegations were under investigation and no conclusion was reached before this case was closed; however, Regina did admit that pornography was viewed in the home.

{¶12} Over Christmas of 2022, Regina was allowed to have visitation with N.A. at her home. Despite the fact that she was specifically ordered not to have any other adults present, Regina allowed her parents to be at the residence. She told N.A. to keep it a secret.

{¶13} On December 29, 2022, JFS filed a motion for permanent custody of N.A. On June 15, 2023, N.A.'s maternal grandparents filed a motion to intervene, seeking legal custody of the child. The trial court then granted this motion to intervene. On June 22, 2023, the trial court scheduled a permanent custody hearing to occur on July 6, July 7, July 31, and August 4, 2023.

{¶14} On June 29, 2023, the grandparents moved for a continuance. In a motion opposing the requested continuance, JFS pointed out that R.C. 2151.414(A)(2) requires a permanent custody hearing is to be held 120 days after

---

[3] N.A. reported that he had kissed his mother with his tongue inside of her mouth, that he had squeezed his mother's breast, buttocks and vaginal area.

the motion is filed and that 184 days had already elapsed. JFS then argued that granting a continuance would push a final decision "well past the statutory 200-day requirement" in R.C. 2151.414(A)(2). The trial court denied the requested continuance.

{¶15} Hearings on the motion for permanent custody were held in the trial court on July 6, July 7, July 31, and August 4, 2023. However, four days were not sufficient to conclude the permanent custody hearing. For this reason, the trial court continued the permanent custody hearing until September 5-7, 2023. Further, at the conclusion of the August 4 hearing, the parties had also indicated a willingness to discuss various alternative courses of action for N.A.'s long-term care. However, on August 22, 2023, the parties indicated that these discussions had not yielded any agreement and that further motions from the parties would be forthcoming.

{¶16} On September 5, 2023, the trial court reconvened for the fifth day of the final hearing. However, despite having the parties present and having the days scheduled for the hearing, the trial court indicated at that time that it was going to dismiss JFS's permanent custody motion. In making its decision, the trial court stated:

> The 200 day period ended on July 16, 2023, at which time not only was the matter to be finished in Court, the hearings on it, but also a decision rendered by that date. We are currently 51 days overdue as of today and we have this set for trial today, tomorrow and Thursday after which time then I will need to file an entry on this or decision on this. Due to my docket and my vacation coming up at the end of September I currently have seven full legal pads of notes from this

and we have three more days of trial, which I'm sure I'll be adding to more legal pads, it would be most likely I would not get a decision done until the end of October which would render us more than 100 days overdue based on this matter. So, I've been discussing this with some other colleagues, judge's [sic] that I have contacts with and have discussed it with them in regard to this matter because it's bothered me so greatly that we are, indeed overdue in this matter that I've decided to dismiss this action based on the statute of time. I invite the agency to refile and request whatever relief they desire. I am not disputing the relief they want. I am just disputing the time matters in this and invite them to do whatever relief, request whatever relief they desire.

(September 5, 2023, Tr. at 3-4).[4]

{¶17} On September 22, 2023, the trial court filed a written judgment entry dismissing this case, having concluded that it was "grossly overdue" according to the statutory guidelines in R.C. 2151.414(A)(2). JFS now brings the instant appeal, asserting the following assignment of error for our review.

**Assignment of Error**

**The trial court abused its discretion when making an arbitrary & unreasonable decision to dismiss based on statutory time requirements.**

*Legal Standard*

{¶18} R.C. 2151.414(A)(2) provides a timeline for trial courts to follow once an agency has filed a motion for permanent custody. Under this provision, a hearing on the motion is not to be held "later than one hundred twenty days after the agency

---

[4] JFS opposed dismissal but indicated that it may be an option if the other parties agreed to stipulate to the roughly 1,000 pages of testimony that had already occurred. JFS states in its brief that the parties were unwilling to stipulate, so JFS filed this appeal.

files the motion * * *." R.C. 2151.414(A)(2). Further, a trial court is to "issue an order that grants, denies, or otherwise disposes of the motion for permanent custody, and journalize the order, not later than two hundred days after the agency files the motion." *Id*. These time requirements are followed by this proviso:

> [t]he failure of the court to comply with the time periods set forth in division (A)(2) of this section does not affect the authority of the court to issue any order under this chapter and does not provide any basis for attacking the jurisdiction of the court or the validity of any order of the court.

*Id*. Since the time limits set forth in R.C. 2151.414(A)(2) are not jurisdictional, a trial court retains the authority to issue an order after these specified periods have expired. *In re B.F.*, 2020-Ohio-3086, ¶ 6 (3d Dist.).

{¶19} Nonetheless, "[a] trial court has broad discretion in proceedings involving the care and custody of children." *In re Mullen*, 2011-Ohio-3361, ¶ 14. Thus, on review, an appellate court determines if the trial court abused its discretion in deciding whether to dismiss the case. *In re Meyer*, 98 Ohio App.3d 189, 193 (3d Dist. 1994); *In re T.W.*, 2012-Ohio-2843, ¶ 19 (3d Dist.); *In re Rachel K.*, 2004-Ohio-5239, ¶ 23 (6th Dist.). More than an error of judgment, an abuse of discretion exists where a trial court renders a decision that is unreasonable, arbitrary, or unconscionable. *In re B.G.*, 2021-Ohio-4250, ¶ 30 (3d Dist.). "When applying the abuse of discretion standard, a reviewing court may not simply substitute its judgment for that of the trial court." *Erwin v. Erwin*, 2009-Ohio-407, ¶ 27 (3d Dist.).

*Analysis*

{¶20} Due to the trial court's dismissal of JFS's permanent custody motion, N.A.'s development, safety, and well-being have been placed in jeopardy. When N.A. was removed from Regina's care, by all accounts he was very delayed, far beyond what he should have been given his cognitive limitations. For over two years after his removal from Regina's care, N.A. progressed significantly in his group home. While N.A.'s progress was not always a straight line upward, he did show significant improvement.

{¶21} By contrast, Regina was largely non-compliant with her case plan. Moreover, she showed terrible judgment in this case by not redirecting N.A.'s prolonged kiss on her mouth, and she violated a court order not to have any adults present over the Christmas holiday. She was also arrested for a theft charge that she allegedly committed while her son K. was with her and that charge was still pending at the time of the final hearing. Regina had multiple prior convictions for various crimes, including one prior felony.

{¶22} We recognize that according to the guidelines—and they are merely guidelines—that the trial court was past due for a decision even at the time the parties reconvened for the fifth day of the final hearing. However, the very fact that this case necessitated as many as seven days for a final hearing shows why the "guidelines" in R.C. 2151.414(A)(2) are not mandatory because there will be outliers. Here, this case was *zealously* litigated by all of the parties involved. The

four days of the final hearing that occurred were replete with objections and discussions regarding admissible evidence.

**{¶23}** Yet on September 5, 2023, despite having all of the parties together for the fifth day of the final hearing, the trial court decided to dismiss the case because it was beyond the suggested statutory guidelines. Had the trial court finished the hearings only two days later as scheduled, it then could have issued a written judgment on the matter—in theory, even before it filed its final judgment entry dismissing the case on September 22, 2023.

**{¶24}** The trial court's dismissal of the case resulted in N.A. being sent back to his mother's care full-time for the first time in over two years. Aside from one Christmas visit, which had its own issues as stated previously, Regina was, at most, visiting in person with N.A. two hours per week. In fact, at the time N.A. was sent back to his mother's care, she had not even had *any* unsupervised visitation in over nine months.[5] N.A.'s GAL, N.A.'s therapist, and the clinical psychologist all indicated it would not be in N.A.'s best interests to be returned to Regina's care.

**{¶25}** Moreover, the trial court's decision to dismiss the case meant N.A. was being sent back to a situation where he had been knowingly exposed to his sexual abuser and to a situation where there were still *pending allegations of sexual abuse against other members of N.A.'s family.* Further, N.A. was being sent back to

---

[5] One of the caseworkers noted that Regina never asked for additional parenting time.

Regina's care even though a psychologist indicated that she was not able to adequately care for N.A. as the sole caregiver due to N.A.'s special needs and Regina's own lack of understanding. N.A.'s therapist specifically testified: "My concerns are if [N.A.] goes back [in Regina's home] he will be sexually abused again. My concerns are that if [N.A.] goes back that every bit of progress that he has made and the independence will be reverted back and regression will occur." N.A.'s therapist testified that there was a "direct correlation" between N.A. visiting Regina and a regression and his behavior. (Tr. at 130).

{¶26} There was also significant testimony indicating that N.A. did not deal well with changes, particularly big changes. A sudden removal from the place he had been progressing for two years and returning him to Regina's environment would seem to readily fall into that category. Testimony also noted that N.A. needs consistency, and Regina had not shown that in her life or through her case plan. Revised Code 2151.01(A) indicates that Chapter 2151 of the Revised Code is to be "liberally interpreted" to provide for the care, protection, and development of children, and the trial court's determination to dismiss the matter so close to its conclusion does not protect N.A.'s development.

{¶27} We are aware that contrary evidence could have been introduced in the last three days of the hearing that would change the evidentiary landscape to some degree. However, we are confined to the record before us. While we generally recognize a trial court's right to control its own docket, and we acknowledge the

statutory timing "guidelines" under R.C. 2151.414(A)(2), the decision here is, simply, unconscionable.

{¶28} The flexibility of the timing guidelines under R.C. 2151.414(A)(2) is exemplified by cases such as *In re M.G.*, 2016-Ohio-5256, ¶ 38 (5th Dist.), wherein a decision on a permanent custody motion after 315 days was not found to be a reversible error because the case "took place over a two day period and produced a voluminous transcript. The additional time involved in the instant case allowed for a full consideration of all the evidence presented[.]" *See also In re B.F.*, 2020-Ohio-3086, ¶ 2 (3d Dist.). Here there was already four days of testimony and three more were forthcoming.

{¶29} Based on the record before us, we find that the trial court abused its discretion by dismissing JFS's permanent custody motion when the hearing was, relatively speaking, so close to completion. Therefore, JFS's assignment of error is sustained.[6]

*Conclusion*

{¶30} Having found error prejudicial to JFS in the particulars assigned and argued, the judgment of the Juvenile Division of the Henry County Court of

---

[6] We note that while there is logic in JFS refiling immediately as the trial court suggested, JFS does have the right to appeal. The trial court's final entry seemed to attempt to dissuade JFS from appealing, stating "Appealing the Court's dismissal provides absolutely no advantages to [N.A.'s] situation, and in fact, would continue to delay a final permanency plan for this child." However, when JFS elected to pursue the appeal, the trial court denied JFS's request for a stay of execution, which could be seen as punitive given the circumstances.

Common Pleas is reversed. This case is remanded to the trial court for further proceedings.

*Judgment Reversed*
*and Cause Remanded*

**ZIMMERMAN, J., concurs.**

**WILLAMOWSKI, P.J., dissents.**

**{¶31}** A trial court's decision to follow the timeframes codified by the General Assembly is not arbitrary, unconscionable, or unreasonable.[7]  For this reason, I respectfully dissent.

**/hls**

---

[7] Appellant argues that the trial court abused its discretion by permitting N.A. to return to Regina.  However, the logic of this argument is undermined by the fact that JFS did not act to prevent N.A. from returning to Regina's custody by filing a new complaint and instead pursued this appeal.